776 So.2d 56 (2000)
HOBART CORPORATION
v.
Scottie W. SCOGGINS.
1980195.
Supreme Court of Alabama.
May 26, 2000.
*57 C.C. Torbert, Tony G. Miller, Michael D. Mulvaney, and Kevin W. Patton of Maynard, Cooper & Gale, P.C., Birmingham, for appellant.
Jere L. Beasley and J. Cole Portis of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., Montgomery; and P. Leigh O'Dell, Colorado Springs, Colorado, for appellee.
PER CURIAM.
Hobart Corporation ("Hobart") appeals from a judgment entered, subject to a remittitur, on a jury verdict in favor of Scottie Scoggins in his products-liability action against Hobart. We affirm in part; reverse in part; and remand.
This dispute arose out of an accident that occurred on February 4, 1995, at the Red & White Grocery in Hayneville, where Scoggins was employed as a meat cutter. At that time, Scoggins's hand came in contact with the moving blade of a meat saw manufactured by Hobart. As a result, a portion of his right index finger was severed. The saw involved in this accident was a Hobart model 5700, which uses a particular "slant-blade" feature.
The manner in which the accident occurred is a matter of sharp contention. However, according to Scoggins's version of events, his hand was injured as he was attempting to cut a "neck bone." More specifically, he alleged that "the slanted blade on the Hobart machine grabbed a neck bone [he] was cutting and pulled the neck bone and his hand into the blade." Complaint, ¶ 11.
Scoggins sued Hobart, contending that the distinctive slant-blade feature rendered the saw unreasonably dangerous for its intended use. In his original complaint, he sought recovery under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). He also sought recovery under the theories that Hobart had negligently or wantonly designed and manufactured the saw and had failed adequately to "warn of hazards associated with the use of the product." Subsequently, Scoggins abandoned the negligence claim and abandoned the AEMLD claim except to the extent it alleged wantonness. As Hobart explains it: "Plaintiff, prior to trial, *58 narrowed his complaint to assert only two claims against Hobart. The first claim was based on wantonness ... under [the AEMLD]; the second claim was purely for wanton conduct. As a result, plaintiffs entire case depended on proving wantonness." Brief of Appellant, at 16.
The cause was tried to a jury. At the close of Scoggins's case and again at the close of all the evidence, Hobart moved for a judgment as a matter of law. Both motions were denied, and the cause was submitted to the jury only on the theory of wanton design, manufacture, and failure to warn.
The jury returned a verdict for Scoggins, awarding him $510,000 in compensatory damages and $10 million in punitive damages. Hobart moved alternatively for a judgment notwithstanding the verdict, a new trial, or a remittitur of the award. The trial court declined to enter a judgment notwithstanding the verdict. It did, however, condition its denial of the new trial motion on Scoggins's acceptance of a remittitur. Scoggins agreed to a remittitur in the amount of $260,000 of the compensatory award and $7.5 million of the punitive award. Thus, the trial court entered a judgment in the amount of $250,000 compensatory damages and $2.5 million punitive damages. Hobart appealed. Hobart raises a number of issues on appeal, particularly regarding the admission of evidence and the sufficiency thereof, and an alleged excessiveness of the verdict. We first address its contention that the trial court erred in denying its motions for a judgment as a matter of law.

I. Evidence of Wantonness
It is undisputed that the model 5700 slant-blade saw designed and manufactured by Hobart involved an innovation in meat-cutting machinery. On that model, the blade was tilted 15 degrees toward the operator, rather than standing perpendicular to the work platform as in "straight-blade" models. Hobart conceived the slant design in the late 1970s. The purpose of the tilt was to "assist the operator in making a cut." (Reporter's Transcript, at 373.) It was thought that it would "take[] less effort for the operator to make the cut on the slant saw than it [would on] the vertical saw," thus reducing operator fatigue. Id. That premise formed the basis on which the saws were eventually advertised and marketed.
Hobart manufactured its first slantblade saw in 1982. The particular saw on which Scoggins was injured was manufactured and sold in July 1983. Hobart contends that Scoggins failed to present substantial evidence of any wantonness on Hobart's part. A fortiori, Hobart contends, Scoggins failed to present clear and convincing evidence of wantonness, as is necessary to sustain an award of punitive damages. Ala.Code 1975, § 6-11-20(a) ("Punitive damages may not be awarded in any civil action, ... other than in a tort action where it is proven by clear and convincing evidence that the defendant ... engaged in ... wantonness ... with regard to the plaintiff"). We agree with the latter contention, but disagree with the former.

A. Clear and Convincing Evidence of Wantonness
The Legislature has defined "wantonness" as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala.Code 1975, § 6-11-20(b)(3). Wantonness involves the "conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256 (Ala.1998) (emphasis added). "Clear and convincing evidence" is "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." Ala.Code 1975, § 6-11-20(b)(4) (emphasis added).
*59 Scoggins concedes that evidence of Hobart's knowledge of the saw's allegedly dangerous properties must predate July 1983, the date of the manufacture and sale of the saw that injured him. One way Scoggins sought to demonstrate that knowledge was through evidence of injuries sustained by other meat cutters on Hobart's slant-blade saw. In this connection, Scoggins states: "On December 2, 1982, George Deboer reported that his finger was lacerated while operating a Model 5700 [slant-blade] saw. (R. 317.) On February 5, 1983, Richard Olmo reported his injury to Hobart. (R. 318.) On February 28, 1982, Gregory Smith reported a thumb laceration to Hobart. (R. 318.)" Brief of Appellee, at 6-7. However, these dates crucial as they areappear nowhere in the evidence. Instead, a search of the record at the places cited by Scoggins reveals that the dates were offered by Scoggins, himself, in his cross-examination of John P. Kelley, Hobart's "manager of product design policy." Significantly, Kelley expressly disavowed knowledge of the dates. Specifically, the following colloquy transpired:
"Q. [By counsel for Scoggins] Does the date October 21, 1982 [Emil] Bonnes does that ring a bell with you?
"A. [By Kelley] That name is familiar. The date isn't.
"Q. Do you recall what type of complaint Mr.[Emil] Bonnes, do you recall his complaint?
"A. No.

"Q. Would that complaint have come to your department?
"A. Very likely it would have. We would have been made aware of it, yes. Of course, I wasn't in that department then.
". . . .
"Q. How about a Richard Olmo, ... in February of '83; do you recall that complaint?
"A. No. Again that's not familiar.

"Q. How about on February 28, 1983, a report of injury to Gregory Smiththumb laceration?
"[Objection made and sustained]."
(Reporter's Transcript, at 311-12.)(Emphasis added.) Hobart correctly points out that "Scoggins's counsel's questions do not constitute evidence." Reply Brief of Appellant, at vi (emphasis in original).
Also, in his questioning of Kelley, Scoggins referred to a list he had composed from discovery materials provided by Hobart. The list purported to contain "97 complaints of injuries since [the] Model 5700 was placed on the market." Brief of Appellee, at 8. To argue that he presented evidence of notice, he contends that these complaints were all relayed to, and essentially ignored by, Hobart. This list, however, was never introduced into evidence. Moreover, there was no showing how manyif anyof the alleged complaints were made within the relevant time frame, namely, July 1982 to July 1983. Like the unauthenticated dates about which Kelley was questioned, the list does not constitute evidence.
In order to rebut Scoggins's contentions as to wantonness, Hobart presented evidence regarding a large number of injuries that had been suffered by meat cutters working on standard, upright-blade saws. Specifically, it presented evidence of between 600 and 800 incidents in which meat cutters were injured during a 5-to-6-year period in the 1980s, according to "Department of Labor statistics." These statistics included injuries on saws of the standard design as well as on saws with Hobart's slant-blade design. In doing so, it attempted to show that the mere fact that meat cutters suffered injuries on meat saws did not constitute evidence indicating that Hobart knew the slant-blade saw was unreasonably dangerous. In other words, Hobart suggested, because the use of the standard design also perennially produced injuries, it could not be inferred that Hobart wantonly designed or manufactured *60 the slant-blade saw, or wantonly failed to warn.[1]
Under § 6-11-20(b)(4), these factors must be weighed in opposition to the evidence presented by Scoggins. Having so weighed them, we conclude that Scoggins failed to present clear and convincing evidence that Hobart designed and manufactured the slant-blade saw with knowledge that it had dangerous propensities and therefore conclude that the jury should not have been allowed to consider an award of punitive damages. Therefore, the trial court erred in denying Hobart's motion for a post-verdict judgment as a matter of law against the claim for punitive damages. Therefore, insofar as it awarded punitive damages, the judgment is reversed, and the cause is remanded. It does not follow, however, that the record does not contain substantial evidence of wantonness.

B. Substantial Evidence of Wantonness
"Substantial evidence" has been defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see Ala.Code 1975, § 12-21-12(d). Indeed, "`[t]he defendant's knowledge, although the sine qua non of wantonness, "may be made to appear like any other fact, by showing circumstances ... from which the fact of knowledge is a legitimate inference."'" Ricketts v. Norfolk Southern Ry., 686 So.2d 1100, 1106 (Ala.1996) (quoting Henderson v. Alabama Power Co., 627 So.2d 878, 882 (Ala.1993)). A number of such circumstances appear of record.
First, the record contains an abundance of evidence indicating that the slant-blade saw was unreasonably dangerous relative to a saw with the standard, vertical-blade design. A number of veteran meat cutterswith experience on both kinds of sawtestified that they were afraid to use the slant-blade saw. Meat cutters for Delchamps, Inc., a company operating a chain of supermarkets, typically complained: "[The saw] feels like it wants to pull meat out of my hand." (Reporter's Transcript, at 249.) (Emphasis added.) For example, Charles Bowman, who worked for Delchamps as a "trouble shooter or a meat specialist," id. at 263, was injured in 1989 on a slant-blade saw after he had had years of virtually injuryfree experience with vertical-blade saws. About the tendency of the slant-blade saw to pull meat from the hands of the meat cutters, he testified as follows:
"Q. [By Scoggins's counsel] What was the primary difference between this slant saw and a vertical saw?
"A. [By Bowman] Well, this [slant-blade] saw was designed to catch the meat and pull it through there at a faster pace. It justI don't know if the blade turns any faster or not but when it gets ahold of the meat, it's just a split second and it's gone.
"Q. Is that because of the angle of the blade?
"A. Yes, sir. It is the way the blade is shaped there.
"Q. So, would the only difference then, in your opinion, be the angle of the blade?
"A. Right.
". . . .
"Q. When you first cut on the slant saw, did it operate any differently than the vertical saws that you had been cutting on?
"A. Yes, sir.
". . . .
"Q. Prior to the day when you were hurt [on the slant-blade saw], did *61 you complain to anybody about the saw?
"A. Yes, sir. Several times.
". . . .
"Q. And did you complain to the Hobart technicians?
"A. Yes, I did.
"Q. What did you complain to the Hobart technicians about?
"A. The first thing I told them was that it was a death trap. I mean, it was plain to see that the thing was not operating like a normal saw and we were scared to death of it and, you know, I just complained.
"Q. Did you complain to the Hobart technicians that it was a death trap?
"A. Yes, sir. I did.
"Q. And why did you tell them that?
"A. Because we were afraid. Even some of my meat cutters came to me when I first came over there and said that they were scared of the saw, and so I started working on it and noticed right away that, you know, it could cut your arm off anytime.

"Q. Did you know that before you were injured?
"A. Yes, sir. I knew it.
"Q. Why did you cut on the saw anyway?
"A. Because we had to. That's the only type saw we had in the meat department. Either that or go home.
"Q. Tell us a little bit, if you will tell the jury, what happened to you when you got hurt. Explaingo through that process and explain how you got hurt.
"A. I had a leg of lamb. I brought a leg of lamb out of the cooler and laid it up on a platform there and I was scared of the saw anyway. I laid it up there and I started cutting it and I had this hand on it pulling it through the blade. Once I did, it hit that leg of lamb and the blade pulled the leg of lamb over, turned it over like a football and caught my wrist right here all the way around to there. Luckily, I just pulled my hand back out of it. I mean, I had to do that in a split second, it was so fast, because it would have [taken] it off in a minute, just that quick.
"Q. I missed a little bit. What did the meat itself do?
"A. It rolled. It just tumbled inside the blade.
"Q. Before or after it hit the blade?
"A. Just as it hit the blade.
"Q. And it took your handyour wristwith it?
"A. Right. Right.
"Q. Had you experienced that sensation before?
"A. Yes, sir. I have cut soup bones, you know. I don't know if you know what a soup bone is, it has got a lot of little meat around the bone and it has got a pretty good size bone ... and when you ease that soup bone into the blade, it just grabs it and throws it all over the room. You never know where it's going next. I've even seen a piece of it go to the ceiling.
"Q. So, if someone told you this saw couldn't pull or jerk meat [into it], what would you tell them?
"A. I would tell them they never [used] it, because it will.
"Q. If someone ... said a saw that does pull or jerk meat [into it] is an unreasonably dangerous saw, would you agree with them?
"A. Yes, sir."
(Reporter's Transcript at 265-73.) (Emphasis added.) Other meat cutters offered similar testimony.
*62 Scoggins also presented the expert testimony of Charles Benedict, a "mechanical engineer." Benedict described and explained in detail the causes of the "rolling," "pulling," "jerking," and "grabbing" that Bowman and other meat cutters had experienced using the slant-blade saw. Benedict testified as follows:
"A. [By Benedict] Well, it is my opinion that the [model] 5700 slant meat saw, Hobart saw, is unreasonably dangerous and it is defective in its design which leads to that unreasonable danger .... The saw, in and of itself, any band saw, any meat saw is dangerous because if you get your fingers in there it will cut them off. And you can, if you are not being careful when you use it.
"The slant saw, on the other hand, is what I call unreasonably dangerous because it has a hidden danger that the operator doesn't know about, that hidden danger is the fact that it can grab hold of the meat and the bone, or the gristle, or the sinew, or, you know, when the meat changes texture, and the blade teeth can grab hold of that and snatch the meat through the saw, and when it does, it snatches the operator's hands with it because the operator is holding on to the meat. And it happens so rapidly that the operator can't let go of the meat before the hand is jerked into the saw blade along with the meat.
"The reason for that is that it is a slant saw and it has what we call a horizontal speed component. In other words, a vertical saw speed is all vertical[]downward. So, if it grabs hold of the meat for some reason, it snatches it downward and it might rotate the meat because if it hits a bone, it can rotate it, but not like a slant saw because [all] of the forces are downward in a vertical saw. The minute you change the blade off of vertical and you feed the meat into the narrow part of the angle that is less than ninety degrees, you now have a horizontal force component that is going through the saw. That is why it saws the meat faster; that is the very reason why the meat gets cut faster with less force, because the saw blade is actually assisting in pulling the meat through the saw blade. So, you already have the saw pulling the meat through the saw as you put pressure behind the meat and it doesn't take much pressure to get the meat going through the saw.
". . . .
"Q. [By Scoggins's counsel] Okay. I'm going to put this [display] up here ... for educational purposes....
". . . .
"Q. Up here on the vertical saw, which is the [model] 5701 saw, you have an arrow pointing down that [indicates that it] saws [at] 700 inches per second; is that right?
"A. Yes, sir.
"Q. And then to the left, it says: `Zero percent inches per second.' Can you tell us or inform us or educate us as to what you are referring [to] here?
". . . .
"A. Seven hundred inches per second is the speed of the blade. In other words, the blade is moving 700 inches per second and that's quite fast when you think about it; 700 inches per second vertically, downward, so there is no velocity component. In other words, the saw doesn't have any movement in the horizontal direction and that is across the top of the table.
"Q. And Dr. Benedict, what is the significance of not having any horizontal movement?
"A. That means that in order for you to get the meat through the saw blade you have to push it through the saw blade, and the instant you stop pushing it it stops, and the faster you want the meat to go through this blade, the harder you have to push the meat.

*63 "Q. And how does that compare over here to the [model 5700] slant saw where it discusses 670 inches per second on the vertical force and 181 inches per second on the horizontal?

"A. Well, the saw-blade speed along the angle, this is 75 degrees, the angle goes from 90 degrees [on the verticalblade saw] to 75 degrees [on the slant-blade saw]. Now, the blade speed is still 700 inches per second, but the vertical speed downward is 676 inches per second, [meaning] it now has the speed across the table at 181 inches per second. So, as you push the meat into this saw blade, the saw blade itself is helping to pull the meat through the saw blade. That's the advantage to it in terms of taking less effort and getting more work done in less time."
(Reporter's Transcript, at 406-11.) (Emphasis added.)
As Benedict explained, the relatively spontaneous "horizontal" movement of meat into the saw blade was the distinguishing feature of the slant-blade design. There was an abundance of evidence indicating that this feature was unreasonably dangerous, not only because it increased the danger to the operator, but, also because the danger was latent. More specifically, the latent danger consisted of the saw's propensitybecause of the horizontal movementto "jerk" or "grab" meat, thus pulling the operator's hands into the blade. Benedict testified that the danger of "grabbing" and "jerking" was inherent in the slant-blade design. There was substantial evidence from which the jury could have concluded that Hobart knew of this propensity at the time it sold the saw that injured Scoggins.
In particular, Hobart essentially touted the horizontal movement of meat as the saw's primary selling point. Specifically, Hobart's sales brochures stated:
"You can cut more meat with less effort, day after day, with our brand-new slant on sawing."
"Increase productivity while you reduce operator fatigue with the new generation of meat saws: the revolutionary Hobart Slant Saw [emphasis in original]."
"Our remarkable SlantSaw has an inclined blade path that greatly reduces the effort it takes to cut various types of product. The SlantSaw actually lets the saw work for the user ... simplifying the operator's job, and resulting in far less fatigue at day's end.
"In recent tests, the SlantSaw and competitive saws were put through the paces of cutting fresh meat, frozen meat and box boneless. And the SlantSaw averaged 20 percent faster actual cutting time, resulting in an average overall production time savings of 11%. So if you average four hours cutting time per day, a SlantSaw can actually pay for itself within only two years in increased productivity."
(Clerk's Record at 1045-50.) (Emphasis added except where otherwise noted.)
The saws contained a decal containing the following notice:

WARNING

MOVING BLADE & PULLEYS

SLANT BLADE REQUIRES LESS FEED EFFORT

KEEP HANDS CLEAR

DO NOT OPERATE WITHOUT COVERS AND GUARDS IN PLACE

DISCONNECT POWER SUPPLY BEFORE CLEANING OR SERVICING
The only "warning" directed to the horizontal movement of meat was the statement: *64 "Slant blade requires less feed effort." Significantly, there was nothing to warn operators that the saw tended to grab meat and pull their hands into the blade. Indeed, Hobart never conceded that the slant-blade saw would do so. However, Benedict analogized the model 5700 saw to angled "miter-box saw[s]," and testified that the tendency of a slant-blade saw to "grab" or "jerk the work piece through" was "well known in the saw industry" and was the subject of warnings in the manuals accompanying miter-box saws. (Reporter's Transcript at 432-33.)
Moreover, Scoggins presented the testimony of Emil Bonnes, a meat cutter with approximately 40 years of experience, who was injured while cutting meat on a Hobart slant-blade saw prior to the date the saw involved in this case was sold. Although Hobart conceded that it had received notice of Bonnes's injury, it did not concede the date of the notice. In this connection, the following colloquy occurred between Hobart representative John P. Kelley and Scoggins's counsel:
"Q. [By Scoggins's counsel] Does the date October 21, 1982[Emil] Bonnesdoes that ring a bell with you?
"A. [By Kelley] That name is familiar. The date isn't.
"Q. Do you recall what type of complaint Mr.[Emil] Bonnes, do you recall his complaint?
"A. No.
". . . .
"Q. Would you maintain a written record on that complaint?
"A. I believe we have that complaint in our database today, yes."
(Reporter's Transcript at 311-12.) (Emphasis added.)
The record does contain evidence, however, sufficient for the jury to infer that Hobart received notice of Bonnes's injury before July 1983. Specifically, Bonnes testified that his employer acquired a slant-blade saw in 1982, and that he was injured approximately "four to six months" after it was "introduced." Id. at 632-33.
Regarding his experience with the saw, he testified:
"Q. [By Scoggins's counsel] Have you ever been cut on a slant saw?
"A. [By Bonnes] On a slant saw, I have. Yes, sir.
"Q. How long had you been operating saws before you ever used a slant saw?
"A. Oh, a good 25 years would be a good guess.
"Q. Twenty-five years before you first used the slant saw?
"A. Yes, sir.
"Q. And you had never been injured before?
"A. No.
"Q. Had you ever had any experience withwhat kind of saws were you using in those 25 years prior to the slant saw?
"A. They were straight saws.
". . . .
"Q. Had you had any occasion where the meat pulled, jerked and pulled into the saw with the straight saw?
"A. No, sir.
". . . .
"Q. What is the control of the meat when using a straight saw?
"A. You have control.

". . . .
"Q. What is the control of the meat when using a slant saw?
"A. Zero.

"Q. Zero?
"A. Zero. That's my opinion, zero.

"Q. Why don't you explain that to me. What do you mean by `zero'?
"A. Well, because the way, the way the saw grabs the meat from the top, especially a bony item which is basically what it's made for. It turns it in such a rapid speed of time you *65 totally have no control over it unless it is a big hunk of meat lying on ... that saw. You can somewhat have control, but I would still have to say, `zero,' zero control of it.
"Q. Okay. What kind of control ... do you have when using the slant saw on a small piece of boneless meat?
"A. Well, it gives me the heebie-jeebies that is, zero.
". . . .
"Q. And in that four-to-six-month period, did you have an opportunity to cut things on that saw like neck bones or stuff like that?
"A. Yes, sir.
"Q. And, how would, how would the cutting perform on a slant saw?
"A. Very carefully.
"Q. And how would the meat react when cutting it with a slant saw?
"A. It would jump. It would slam your fingers, the meat would hit so hard and it would pinch your finger below the meat and the table on the saw.

"Q. What about cutting that exact same type of meat on a straight saw?
"A. No problem. No problem.

"Q. And do you use the straight saw today?
"A. Yes, sir.
"Q. Do you feel it's dangerous?
". . . .
"A. No, I don't believe a straight saw iswell, any machinery is dangerous.
". . . .
"A. But, when you have control over that machinery, then you are more relaxed with it.
"Q. Do you have control over the straight saw?
"A. Yes, sir.
"Q. What about the slant saw like this one over here?
"A. No, sir. Oh, you've got one. Oh, boy. I haven't seen one of those for years.
"Q. Would you operate a slant saw today?
"A. No, sir.
"Q. Why not?
"A. I just totally refuse to operate
"Q. Why would you refuse to?
"A. That saw was made for power and production with [no] safety into it whatsoever for the person that was operating it.

"Q. Okay. And is that because it will pull and yank the meat into the saw?
"A. Absolutely. Yes, sir.
". . . .
"Q. All right. Thank you sir. One other question. Did you file a lawsuit related to your incident?

"A. Yes, sir."
(Reporter's Transcript at 628-35.) (Emphasis added.) Hobart did notand does notexpressly argue that it did not receive notice of Bonnes's injury before July 1983. Considering that fact, along with the facts (1) that Bonnes was definitely injured before July 1983, and (2) that Bonnes sued Hobart over the incident, the jury could have inferred that Hobart had notice within the relevant chronological framework.
The extensive testimony of Bonnes, Bowman, and other meat cutters as to the dangers associated with the saw was relevant and admissible on the wantonness issue in another sense. As we have noted previously in this opinion, Hobart does not concede that the slant-blade saw "grabs" or "jerks" meat from the operators' hands. Significantly, it contends that its saw was subjected to extensive field tests under actual conditions before it was marketed and that none of the users in the field tests noted or complained of a tendency to *66 "grab." It insists that all the injuries were the result of operator error. Thus, evidence that the saw acquired early on a particularly bad reputation among meat cutterswhere Hobart expressly denied any knowledge of a dangerous propensity was relevant on the question whether Hobart's representatives were testifying truthfully about the extent of their knowledge. In other words, the testimony provided some evidence that the dangerous propensities were so pervasive and notorious that Hobart not only should have known, but, through its concededly extensive field testing, did know.
In short, there was evidence, although not of "such quality and weight," Ex parte Norwood Hodges Motor Co., 680 So.2d 245, 249 (Ala.1996), to "warrant[] submitting the issue of punitive damages to the jury," id., of wantonness in the manufacture and marketing of Hobart's slant-blade saw. Thus, the trial court did not err in denying Hobart's motions for a judgment as a matter of law as to the claims of wantonness.

II. Excessiveness of the Verdict
Hobart also argues that the award of compensatory damages, even as remitted, was excessive. We disagree with this argument. The rule is well settled that "[t]here is no fixed standard for ascertainment of compensatory damages recoverable... for physical pain and mental suffering." Alabama Power Co. v. Mosley, 294 Ala. 394, 401, 318 So.2d 260, 266 (1975) (emphasis added). "[T]he amount of such [an] award is left to the sound discretion of the jury, subject only to correction by the court for clear abuse or passionate exercise of that discretion." Id.
In this case, Scoggins suffered the traumatic amputation of a substantial portion of his right index finger and as a result was unable to work for approximately three months. Repair of the remaining portion of his finger required reconstructive surgery, after physicians' attempts to reattach the severed portion were unsuccessful. Subsequently, physical therapy was required. Scoggins is permanently disfigured.
In what had been Scoggins's customary sports activities, he is now either unable to engage at all or able to engage only with substantial difficulty. Even more significant is the effect of his injury on his ability to engage in his profession. For example, he said the injured finger "throbs and burns" in the reduced temperatures in which meat cutters often operate. Also, he said his injury continually interferes with his ability to cut meat with a knife.
In support of its excessiveness argument, Hobart cites Kmart Corp. v. Kyles, 723 So.2d 572 (Ala.1998); Sears, Roebuck & Co. v. Harris, 630 So.2d 1018 (Ala.), cert. denied, 511 U.S. 1128, 114 S.Ct. 2135, 128 L.Ed.2d 865 (1994); Crosby v. Avon Products, Inc., 474 So.2d 642 (Ala.1985); and Coca-Cola Bottling Co. v. Parker, 451 So.2d 786 (Ala.1984). Those cases are clearly inapposite. None of them involved a traumatic amputation or permanent disfigurement as does this case. Thus, we conclude that the cases do not support Hobart's argument, but that the record does support the award of $250,000.

III. Conclusion
We have examined other arguments presented by Hobart and conclude that they are either mooted by our disposition of the punitive-damages issue or are without merit. In particular, we have examined Hobart's contention that Scoggins was not cutting meat with the saw when he was injured and, therefore, that the design defect was not a cause in fact of the accident. In reality, the testimony was in sharp dispute on that issue. Therefore, it presented a classic jury question, which the jury resolved in favor of Scoggins.
In summary, the trial court erred only in submitting the issue of punitive damages to the jury. That portion of the judgment awarding punitive damages is, therefore, reversed and the cause is remanded. The trial court did not err, however, in submitting the wantonness claims *67 to the jury. Consequently, that portion of the judgment awarding $250,000 in compensatory damages is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MADDOX, COOK, JOHNSTONE, and ENGLAND, JJ., concur.
LYONS, J., concurs in Part I.A. and Part II; and concurs in the result in Part I.B.
HOUSTON, J., concurs in the result.
HOOPER, C.J., and SEE and BROWN, JJ., concur in Part I.A. and dissent from Part I.B.
HOOPER, Chief Justice (concurring in Part I.A. and dissenting from Part I.B.).
I concur in Part I.A. and, therefore, in the reversal of the punitive-damages award. I dissent from Part I.B. and, therefore, from the affirmance of the compensatory-damages award.
In order to prove wanton conduct, Scoggins had to present evidence that Hobart, before July 1983, knew the slant-blade saw had dangerous propensities; July 1983 was the date of the manufacture and sale of the saw that Scoggins says injured him. Scoggins presented evidence from other meat cutters who had made complaints about the saw. However, as the main opinion specifically states, the dates of these complaints "crucial as they areappear nowhere in the evidence." 776 So.2d at 59. I agree that Scoggins failed to present clear and convincing evidence indicating Hobart acted wantonly. Scoggins did not produce any evidence indicating Hobart knew of the allegedly dangerous propensities of the slant-blade saw before it manufactured and sold the particular saw that Scoggins says injured him. Thus, I concur in the holding that the trial court erred in denying Hobart's motion for a judgment as a matter of law directed toward the punitive-damages claim.
I disagree with the holding that Scoggins's evidencethe same evidence that was not "clear and convincing" on the question of wantonnessis sufficient to constitute substantial evidence of wantonness and thus to support the award of compensatory damages. The conclusions of the main opinion are inconsistent and incompatible. The main opinion specifically states that there is no evidence in the record as to when the complaints about the saw were made.
The main opinion relies on the testimony of Emil Bonnes, who stated that he was injured by a slant-blade saw manufactured by Hobart, approximately 4 to 6 months after it was "introduced" in 1982. Bonnes testified that he made a complaint with Hobart and that he sued Hobart. However, the record gives no indication of the date when Bonnes made his complaint or when he sued Hobart. It gives no indication that these events occurred before July 1983. Furthermore, even if Bonnes did make his complaint to Hobart before July 1983, one isolated accident is insufficient to put Hobart on notice that the saw was unreasonably dangerous.
The main opinion also recounts the testimony of numerous meat cutters who regard the saw as dangerous. However, none of these meat cutters testified that they were injured before July 1983. The so-called "abundance of evidence indicating that the slant-blade saw was unreasonably dangerous relative to a saw with the standard, vertical-blade design," 776 So.2d at 60, is entirely irrelevant to the question whether, before July 1983, Hobart had notice that the saw was dangerous. Furthermore, the fact that a few meat cutters were injured using the slant-blade saw, in the face of evidence that 600-800 meat cutters are injured yearly on commercial meat cutters, does not provide notice that this particular saw was unreasonably dangerous.
Scoggins did not present substantial evidence indicating that Hobart, before July 1983, knew of the allegedly dangerous propensities of the slant-blade saw. Therefore, *68 he did not present substantial evidence of wantonness. I would reverse both the award of punitive damages and the award of compensatory damages.
SEE and BROWN, JJ., concur.
NOTES
[1] In this connection, we note that Scoggins's expert witness, Charles Benedictof whom we say more in the next subpart of this opinion testified that the slant-blade saw was unreasonably dangerous. However, Benedict had never personally tested a slant-blade saw.