Ronald Ammons, by and through Wausau Insurance Company ("Wausau"), and Tesker Manufacturing Corporation ("Tesker") appeal and cross appeal, respectively, from a judgment entered on a jury verdict in favor of Tesker in an action in which Wausau sought reimbursement of workers' compensation benefits it paid to Ammons on behalf of Vulcan Threaded Products ("Vulcan"), Ammons's former employer. We affirm.
On September 26, 1996, Ammons was injured during the course of his employment with Vulcan. At the time of the injury, Ammons was operating a "thread-rolling machine" (the "threader"), a component part of which was manufactured by Tesker. The threader is a semiautomated device that threads metal rods as the rods are fed into it. The threader and the threading operation are more specifically described by Tesker as follows:
 "[T]he middle component of this machine was manufactured by [Tesker], which manufactured the thread rolling units and the dies that go on them. There was also an infeed and [an] outfeed table that attached to each side of the unit. These extra components are known as fixtures. Tesker did not manufacture these parts for Vulcan. These components in conjunction with the *Page 212 
Tesker machine form the threading machine. . . .
 "These three components combine to place threads on metal rods. The rods used on this machine were approximately a quarter inch in diameter. These metal rods are considered ductile and easily bendable. The threading process works by placing a rod on [an] infeed table. A cylinder automatically feeds the rod into a tube that is in the front of the die and the rod is inserted into the machine. Once it is started, the dies turn the bar so it may be threaded. There are two support blades that trap a rod on four sides which prevent a rod from jumping out of the die or missing the exit tube. . . . After threading, the rod is fed into an exit tube. The exit tube is covered with a lexon guard in case of a misfeed. When a die is changed on the Tesker unit, the exit tube must be realigned. The dies on the Tesker unit are changed periodically to conform with the size of the rod being inserted into the machine. Therefore, there is no permanent configuration for the exit tube. Consequently, if the exit tube is misaligned the tube can misfeed."
Tesker's Brief, at 5-7 (citations to the record omitted).
Ammons was injured when a metal shard was ejected from the machine. The metal struck him in the face, causing the loss of an eye. Wausau, Vulcan's workers' compensation insurer, paid benefits on behalf of Vulcan.
These proceedings began on March 24, 1999, with the filing of a complaint against Tesker, naming as plaintiffs Ammons and Wausau (hereinafter referred to collectively as "Wausau"). Wausau seeks reimbursement, pursuant to Ala. Code 1975, § 25-5-11(d), of the benefits it paid. The complaint alleged that the threader was defectively designed and manufactured and included claims of negligence, wantonness, failure to warn, breach of warranty, and breach of the Alabama Extended Manufacturer's Liability Doctrine. Tesker answered the complaint, asserting various affirmative defenses, including contributory negligence. It did not, however, assert the defense of assumption of the risk.
At the close of the plaintiffs' case-in-chief, Tesker moved, over Wausau's objection, to amend its answer to assert the affirmative defense of assumption of the risk. The trial court granted that motion, stating that it would allow Wausau to "reopen its case," if it "need[ed] to put on additional evidence." Wausau did not exercise that option.
Tesker also moved for a judgment as a matter of law ("JML") as to Wausau's wantonness-based claims. The trial court also granted that motion. Additionally, Tesker moved for a JML on all other claims, contending that they were barred by the statute of limitations. That motion was denied.
Over Wausau's objections, the court charged the jury on the affirmative defense of assumption of the risk. The jury returned a verdict for Tesker, and the trial court entered a judgment on that verdict. Wausau moved for a new trial, and renewed its challenge to the jury charge on the assumption-of-the-risk defense. In an order entered on January 28, 2002, the trial court denied Wausau's motion. From the order and the judgment, Wausau appealed (case no. 1011213). Tesker cross appealed from the judgment, contending, among other things, that the trial court erred in denying its motion for a JML on the statute-of-limitations ground (case no. 1011313).
 I. The Appeal — Case No. 1011213
Wausau presents two issues on appeal. First, it contends that the trial court erred *Page 213 
in entering a JML in favor of Tesker on the wantonness claims. Second, it insists that the trial court erred in allowing Tesker to amend its answer to assert the defense of assumption of the risk, which defense was submitted to the jury.
 A. Wantonness
"The Legislature has defined `wantonness' as `[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others.' Ala. Code 1975, § 6-11-20(b)(3)." Hobart Corp. v.Scoggins, 776 So.2d 56, 58 (Ala. 2000). "Wantonness involves the `conscious doing of some act or the omission of some duty, while knowing
of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.'" Id. (quoting Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256 (Ala. 1998)) (emphasis added in Scoggins). Thus, "[t]he `knowledge' of the defendant is `the sine qua non of wantonness.'" Norris v. City of Montgomery,821 So.2d 149, 156 n. 9 (Ala. 2001) (quoting Ricketts v. Norfolk SouthernRy., 686 So.2d 1100, 1106 (Ala. 1996)). Wausau contends that it "presented substantial evidence of wantonness, such that the issue should have gone to the jury for determination." Wausau's Brief, at 19.
When it arrived at Vulcan, the threader was equipped with a guard and a warning sign. The warning sign, which was approximately 7½ inches wide and 8½ inches long, read:
"DANGER
 "NEVER OPERATE MACHINE WITH GUARDS OR SAFETY DEVICES REMOVED.
 "KEEP HANDS AWAY FROM PINCH POINTS. ALWAYS WEAR EYE PROTECTION.
"DO NOT ATTEMPT TO HOLD ROTATING PARTS WHILE BEING ROLLED.
 "DISCONNECT ELECTRICAL POWER BEFORE SETTING UP, SERVICING OR ADJUSTING MACHINE."
(Capitalization original; emphasis added.) There was testimony at trial indicating that Vulcan had removed the original guard and had installed another guard before this accident.
Wausau argues that, based on Tesker's knowledge of the dangers posed by the threader, as Wausau perceives it, Tesker should have provided a "better safety guard" and a more conspicuous warning. Failure to do so, Wausau insists, was wanton. We disagree.
As to what Tesker allegedly knew, Wausau states: "Defendant Tesker admitted actual knowledge that its thread rolling machines could throwpieces of metal." Wausau's Brief, at 21 (emphasis added). This statement, however, mischaracterizes the evidence. Specifically, Richard Tesker, the owner of Tesker, testified:
 "Q. [By counsel for Ammons] But you have acknowledged that you have knowledge that they can be set up improperly, haven't you?
 "A. [By Richard Tesker] Yes. And I have seen people that don't use tubes put angle iron in and that's where they will get whipping. That's where I have seen it.
 "Q. But that's not Vulcan. They put a tube on it, don't they?
"A. Correct.
 "Q. And you have still seen tubes misalign with the dies, correct?
"A. Yes.
 "Q. And this whipping you are talking about, describe that for the jury. What is that? *Page 214 
 "A. As the bar is spinning, it comes out through the tube or the angle iron of, you know — it's normally on angle iron. The part comes out. It starts spinning and it's a smaller diameter. There is nothing there to stabilize it. So as it's going through it sticks out three or four feet, five feet, and it will start a whip to it and start bending up. That's why you never run a machine without a drive shaft guard on it because that will contain the whipping part inside.
 "Q. It's possible that when the rod comes through the exit tube that it would bend and miss the guard, isn't it, because the guard doesn't cover that?
"A. What was that?
 "Q. It's possible from your knowledge and working on these machines and designing these machines —
"A. Correct.
 "Q. — that the rod would misalign from that tube and miss the guard if it were to bend, correct?
". . . .
 "A. Yes. If the tube is not set up correctly, it could miss that and it would start bending around in there somewhere.
"Q. And it would whip?
 "A. Right. But it would go out straight a section before it would start to whip."
Reporter's transcript, at 511-12 (emphasis added), quoted in Wausau's Brief, at 21-22.
Tesker notes that this testimony establishes only knowledge that the threader "could misfeed," and, consequently, bend or whip, "if it is not properly setup." Tesker's Brief, at 18. It does not establish knowledge that the threader would "throw pieces of metal," as Wausau alleges in its brief at page 21, or that "an injury will likely or probably result even if the unit is not properly setup." Tesker's Brief, at 18 (emphasis added). Moreover, according to Richard Tesker's testimony, the "whipping" he observed occurred only when the threader was used in connection with "angle iron," a situation not present the day of the accident. Indeed, there was no evidence indicating that Tesker knew that the threader would function — or malfunction — as it did on the day of the accident.
Ammons was operating the threader on the day of the accident without safety glasses. He noticed that pieces of metal were flying from the machine. As one shard flew past his head, he noticed that the floor around the threader was littered with such fragments. He stated:
 "It was then I noticed metal — there was metal back there on the floor when I got there and there was metal coming out of the machine. There were rods coming out of the machine that were broken and jagged. There were rods that were coming out of the machine and breaking and pieces flying around."
(Reporter's Transcript, at 197.) In that connection, Ammons also testified:
 "Q. [By counsel for Ammons] And now what did you do when you realized that the machine was malfunctioning?
 "A. [By Ammons] Well, after awhile, when I realized that all the metal was definitely coming out of the machine and [there] wasn't anything we could do about it, I told a co-employee that the machine was tearing the rods up and I was concerned about it.
"Q. Okay. What happened then?
 "A. [He] went over there and he cut the machine off. . . . He cut the *Page 215 
machine off and he went over to the maintenance board at Vulcan and wrote on the board: `Number three slinging rods.' And he put quotation marks around `slinging rods.'
". . . .
"Q. Then what happened?
 "A. Well, the maintenance man responded to it. He came back to the machine and asked me — he had kind of a funny look on his face. He asked me what [was] wrong with it, and I told him. I said: `It's tearing the rods up and it's dangerous,' and I motioned towards the metal back on the floor.
". . . .
 "Q. And before the day that this machine began malfunctioning, did you ever see this machine throw pieces of metal out of it before that day during the three weeks you were there?
"A. No, I did not.
 "Q. And tell me how many times if you will — I know I may be getting ahead of myself but how many times did you see the machine, actually see the machine throw pieces of metal out of it?
"A. I saw five pieces of metal come out of that machine.
". . . .
 "Q. What happened after the leadman . . . came back to the machine?
 "A. He came back to the machine and he had a bottle of spray in his hands, a plastic bottle with spray and he sprayed — he never said anything to me. He sprayed the rods on the feed table and just throughly sprayed them and set the bottle of spray on the machine and cut the machine back on, and, as he was leaving, he said: `Be careful.'
"Q. At that point, did you go back to work?
"A. Yes.
". . . .
 "Q. All right. And, at that point — tell me what happened next if anything.
 "A. Well, I was still concerned about the machine and I walked back over to it to see if it was, you know, still if it was, you know, throwing metal out of it. And I walked back over to it and I was standing about seven feet and I wasn't actually looking at the machine. I was just standing there.
"Q. Okay. I'm sorry. How far were you from the machine?
 "A. About seven feet and I was just standing there kind of catching my breath and I wasn't actually looking at the machine. And I heard a rod start through it that makes the noise every time the rod goes through. It's a mechanical noise. I heard the rod start through it and all the sudden it made a racket, one sharp burst of noise and that was when I felt the rod. It flew right out of the machine into my eye, a piece of metal."
(Reporter's Transcript, 197-205.)
Ammons's description of the accident differs fundamentally from the phenomenon described by Richard Tesker. In particular, Richard Tesker's testimony describes only the threader's ability to "bend" or "whip" metal under certain conditions. It does not acknowledge a tendency to shatter
metal and hurl the fragments for several feet, as Ammons described. Moreover, Wausau produced no evidence of similar incidents involving *Page 216 
other machines or of any other accidents involving Tesker threaders.
In short, Wausau produced no substantial evidence of wantonness. The trial court did not err, therefore, in granting Tesker's motion for a JML on the wantonness-based claims.
 B. Assumption of the Risk
Wausau also contends that the trial court erred in allowing Tesker to amend its answer at the close of Wausau's case-in-chief to assert the affirmative defense of assumption of the risk. Tesker responds that the issue was tried by the express consent of the parties, and that, in any case, Wausau has failed to show that it was prejudiced by the amendment.
Wausau concedes, as it must, that the Alabama Rules of Civil Procedure allow amendments to the complaint to conform to the evidence presented during trial. In particular, Ala.R.Civ.P. 15(b) states:
 "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to
at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence. An amendment shall not be refused under subdivision (a) and (b) of this rule solely because it adds a claim or defense, changes a claim or defense, or works a complete change in parties. The Court is to be liberal in granting permission to amend when justice so requires."
(Emphasis added.) See also Ala.R.Civ.P. 54(c) ("every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings").
"Rule 15(b) is not permissive: it provides that issues tried by express or implied consent shall be treated as if raised in the pleadings." Hawkv. Bavarian Motor Works, 342 So.2d 355, 358 (Ala. 1977) (first emphasis added). "If a party objects to the introduction of evidence at the trial on the ground that it is not within the issues framed by the pleadings, he must show that he would be actually prejudiced in maintaining his action or defense on the merits by the admission of the evidence." Id. (emphasis added).
"We also note that a determination `as to whether [an] issue has been tried by express or implied consent under Rule 15(b) is a matter for the trial court's sound discretion, which will not be altered on appeal absent an abuse [of that discretion].'" International Rehab. Assocs.,Inc., v. Adams, 613 So.2d 1207, 1214 (Ala. 1992) (quoting McCollum v.Reeves, 521 So.2d 13, 16 (Ala. 1987)). "`[W]hether pleadings are deemed to be amended in order to conform to the evidence presented is also a matter within the discretion of the trial court,' and a decision in that regard will not be disturbed on appeal absent an abuse of discretion."Adams, *Page 217 
613 So.2d at 1214 (quoting McCollum, 521 So.2d at 16-17).
Wausau concedes that it "tried the issue of contributory negligence," but insists that it "did not thereby impliedly try the issue of assumption of the risk at the same time." Wausau's Brief, at 34. Additionally, Wausau contends that it was prejudiced by the amendment allowing Tesker to raise the affirmative defense of assumption of the risk because the amendment was not made until after Wausau's case-in-chief. More specifically, it argues:
 "Had [Wausau] known that Defendant Tesker intended to raise the affirmative defense of assumption of the risk, [Wausau] would have conducted discovery and the trial differently. [Wausau] would have brought up the issue during voir dire in order to determine any juror bias. Also, [Wausau] would have addressed the issue during [Wausau's] opening statements. Further, [Wausau's] counsel would have elicited testimony from Ronald Ammons concerning what he subjectively knew and appreciated moments before and at the time of his injury and could have focused on this evidence. However, [Wausau] was never given these opportunities."
Wausau's Brief, at 40 (emphasis added).
We disagree with this argument in a number of particulars. The defenses of contributory negligence and assumption of the risk differ in only one material respect — namely, the plaintiff's awareness of the danger. "With regard to assumption of the risk, `the plaintiff's state of mind is determined by [a] subjective standard.'" H.R.H. Metals, Inc. v.Miller, [Ms. 1002015, April 19, 2002] 833 So.2d 18, 27 (Ala. 2002) (emphasis added) (quoting McIsaac v. Monte Carlo Club, Inc., 587 So.2d 320,324 (Ala. 1991)). Contributory negligence, by contrast, "involves anobjective standard." Id. We fail to see how anyone but Ammons could testify as to what Ammons subjectively knew.
This is a crucial consideration in light of Ammons's thorough narrative of the details of the accident during Wausau's case-in-chief. The narrative leaves little to the imagination regarding Ammons's comprehension of the situation at the time of the accident. It is also crucial in view of the trial court's offer to allow Wausau to "reopen its case" to elicit just such testimony from Ammons. In that connection, the following colloquy occurred at the end of Wausau's case-in-chief:
 "[Ammons's counsel] If we may be heard, the plaintiff has already put on their case-in-chief in this case before any assumption of the risk has been brought up and the elements of assumption of the risk are different than the elements of a customary [contributory-negligence] defense. Marginally, but ever so slightly, those elements —
 "[The Court] Appreciation of danger is the only difference.
 "[Ammons's counsel] Right, your Honor. And we would object and we think the plaintiff is prejudiced by bringing that defense in at this late time.
 "[The Court] I will grant defendant's oral request to amend their pleadings to include a defense of assumption of the risk. I will, however, if [the] plaintiff in light of that ruling wishes to reopen its case, if you have any additional evidence that you could present with regard to that issue — I mean, it boils down to . . . Mr. Ammons's testimony. He is the only one. The appreciation of risk goes down to him and he is available still. So, if there is any element of that that causes you [to] need to put on additional evidence, I will allow you to do so before [the] defendant puts on theirs, and/or you may use that as testimony if you — *Page 218 
 "[Counsel for Ammons] Your Honor, we reserve the right to do that as rebuttal."
(Reporter's Transcript, at 690-91 (emphasis added).)
Wausau ultimately declined the court's invitation to recall Ammons to the witness stand or to present evidence otherwise tending to rebut the defense. This factor undermines Wausau's prejudice argument. Considering the elements of this affirmative defense, the testimony of the injured party that was actually produced before Tesker's motion to amend its complaint, the fact that the testimony was volunteered by Wausau, and Wausau's decision not to present any further evidence as to that party's subjective awareness of the danger, we conclude that Wausau has failed to demonstrate that it was prejudiced by the amendment. The trial court did not abuse its discretion, therefore, in allowing the amendment.[1]
 II. The Cross-Appeal — Case No. 1011313
Our resolution of the issues presented by case no. 1011213 renders it unnecessary to consider the issues presented by Tesker's cross-appeal. Therefore, we pretermit any discussion of those issues.
 III. Summary
The trial court did not err in entering a JML for Tesker on the wantonness-based claims. Neither did it abuse its discretion in allowing Tesker to amend its answer to assert the affirmative defense of assumption of the risk. Consequently, it did not err in denying Wausau's motion for a new trial. The judgment of the trial court is, therefore, affirmed.
1011213 — AFFIRMED.
1011313 — DISMISSED AS MOOT.
Moore, C.J., and Houston, Lyons, and Johnstone, JJ., concur.
[1] Wausau does not contend that evidence of assumption of the risk was insufficient to allow that defense to go to the jury.