[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1137 
 I. Background
Dr. Dwight Hooper is a physician who specializes in obstetrics and gynecology. In 1994 he entered into a three-year employment contract with Columbus Regional Healthcare System, Inc. Under the agreement, Columbus Regional Healthcare provided Dr. Hooper with hospital privileges at the Medical Center in Columbus, Georgia, and at Phenix Regional Hospital in Phenix City, Alabama. Columbus Regional Healthcare owns and operates the Medical Center. Columbus Regional Healthcare owns Phenix Healthcare Services, Inc. (hereinafter collectively "Columbus"), which owned and operated the Phenix Regional Hospital until it closed. On October 29, 1997, Dr. Hooper and Columbus entered into a new three-year employment agreement that provided for the automatic renewal of the agreement thereafter on an annual basis.
At the center of this case is a provision of the employment agreement that required Columbus to pay professional-liability insurance premiums for Dr. Hooper at the "standard rate." The agreement provided that, in the event Dr. Hooper was not insurable through Columbus at the standard rate, Columbus was obligated to pay the standard rate charged by the insurer for physicians in similar practices in Columbus, Georgia. Any portion of the insurance premium that exceeded the standard rate was to be paid by Dr. Hooper. *Page 1138 
Beginning in 1998, Dr. Hooper and Columbus were named as defendants in several malpractice actions. As a result of settlement negotiations in one of those actions, Columbus was required to pay the plaintiff $50,000 above the amount Dr. Hooper's insurer had agreed to pay. According to testimony in this case, at that point the relationship between Dr. Hooper and Columbus began to deteriorate.
Shortly after the settlement in the medical-malpractice case, Lynne Anderson, a senior vice president of Columbus, informed Dr. Hooper that the insurer would not renew his professional-liability insurance policy when it expired in July 2000. Anderson also informed Dr. Hooper that he was no longer insurable at the standard rate and that he would have to find an insurance company that would provide non-standard-rate coverage.
In July 2000, Dr. Hooper met with Larry Sanders, the chief executive officer of Columbus. At that meeting, according to Dr. Hooper, Sanders was uncharacteristically hostile and rude, and he made several insulting remarks concerning Dr. Hooper's competence as a physician. Sanders also stated: "I am sure you are looking for other [employment] opportunities; I would if I were you." (Dr. Hooper's brief at 14.)
Although Dr. Hooper did write to the Seton Medical Group in Baltimore, Maryland, to inquire about possible employment, he continued working at Columbus while exploring options for non-standard-rate insurance coverage. Parker Harvey, an insurance broker in Atlanta, Georgia, referred to Dr. Hooper by Anderson, advised Dr. Hooper that the best rate he could find for professional-liability insurance coverage for physicians in similar practices in Columbus was $36,510 annually, which was more than double Dr. Hooper's previous premiums of approximately $15,000. Dr. Hooper gave this information to Don Elder, the senior vice president at Columbus who was handling Dr. Hooper's insurance matter, and requested that Columbus pay the $36,510 premium as required by the employment contract. Elder responded that Columbus would pay $15,000 "and not a penny more." (Dr. Hooper's brief at 16.)
Dr. Hooper subsequently secured nonstandard-rate professional-liability insurance coverage; because of the malpractice actions that had been brought against him, his annual premium for the coverage was $110,884. Columbus paid $15,000 toward the premium, and, although Dr. Hooper paid the balance of the premium, he argues that Columbus should have paid $36,510 toward his premium of $110,884.
The relationship between Dr. Hooper and Columbus continued to deteriorate. Dr. Hooper's last day working for Columbus was November 10, 2000; he then moved to Baltimore to start work for the Seton Medical Group. Dr. Hooper had made arrangements with two other physicians to care for his patients. Approximately one month after moving to Baltimore, Dr. Hooper decided to return to Phenix City and open an independent practice. He stated that he had made insurance arrangements with Parker Harvey to take effect on the date of the scheduled opening of his private practice. When Columbus learned that Dr. Hooper planned to open a private practice in the area, however, it withdrew Dr. Hooper's hospital privileges, citing as grounds Dr. Hooper's alleged lack of professional-liability insurance coverage and his alleged abandonment of his patients.
After several additional interactions, Columbus offered Dr. Hooper the opportunity to voluntarily resign his hospital privileges, in exchange for which Columbus would not file a report with the National Practitioner Data Bank, which ordinarily *Page 1139 
required the report of all suspensions of hospital privileges that exceeded 30 days. Dr. Hooper regarded these terms as contrary to Columbus's own bylaws and as a blatant attempt to blemish his professional record. He concluded, however, that he had no choice but to agree to the terms. Dr. Hooper was ultimately unable to establish his own practice in Phenix City, and he eventually moved to Tuscaloosa, where he took a job practicing with the Capstone Medical Group at the University of Alabama.
Dr. Hooper sued Columbus in the Russell Circuit Court. He initially alleged 11 causes of action, but he eventually dropped all except the breach-of-contract, wanton-and/or willful-conduct, and civil-conspiracy claims. Columbus Regional Healthcare filed a counterclaim against Dr. Hooper, alleging breach of contract. Extensive discovery was conducted, and the parties moved for a summary judgment. The trial court granted Columbus's motion for a summary judgment on Dr. Hooper's claims, and the trial court certified that judgment as final pursuant to Rule 54(b), Ala.R.Civ.P. Columbus Regional Healthcare's counterclaim remains pending in the trial court. Dr. Hooper appealed.
 II. Standard of Review
We review a summary judgment de novo. Potter v. First RealEstate Co., 844 So.2d 540, 545 (Ala. 2002) (citingAmerican Liberty Ins. Co. v. AmSouth Bank,825 So.2d 786 (Ala. 2002)).
 "`We apply the same standard of review the trial court used in determining whether the evidence presented to the trial court created a genuine issue of material fact. Once a party moving for a summary judgment establishes that no genuine issue of material fact exists, the burden shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." In reviewing a summary judgment, we view the evidence in the light most favorable to the nonmovant and entertain such reasonable inferences as the jury would have been free to draw.'"
844 So.2d at 545 (quoting Nationwide Prop. Cas. Ins.Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala. 2000)) (citations omitted).
Summary judgment is appropriate only when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P.
 III. Analysis
A. Breach of Contract
"`To establish a breach-of-contract claim, a plaintiff must show "`(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'"'" Jonesv. Alfa Mut. Ins. Co., 875 So.2d 1189, 1195
(Ala. 2003) (quoting Ex parte Coleman, 861 So.2d 1080,1085 (Ala. 2003)).
Although the existence of a valid contract, i.e., the employment agreement, in this case is not disputed, the parties dispute the performance and damages elements of the breach-of-contract claim. For example, although Dr. Hooper provided evidence indicating that he performed as required under the employment agreement until his relationship with Columbus soured in 2000, Columbus argues that Dr. Hooper breached their agreement by leaving Columbus's employment without the 12 months' notice required by § 10(a) of the employment agreement. Dr. Hooper does *Page 1140 
not dispute that he failed to provide such notice; however, he asserts that Columbus breached the contract first by failing to pay the share of Dr. Hooper's professional-liability insurance it was required to pay under the agreement. Consequently, the question of Columbus's alleged nonperformance under the employment agreement must be answered to determine whether Dr. Hooper's failure to perform his obligations under the agreement is actionable.
Dr. Hooper offered evidence indicating that Columbus breached the employment agreement first when it refused to pay the standard-rate premium of $36,510, as quoted by Parker Harvey, for physicians in similar practices in Columbus, Georgia. Columbus claims that its failure to pay the $36,510 portion of the premium was not a breach of the employment agreement because, it says, it was obligated to pay only $15,000, what it considered the standard rate. Columbus argues that the term "standard rate" as used in the employment agreement refers to the normal rate charged for professional-liability insurance for physicians generally, i.e., $15,000. Dr. Hooper argues that the term "standard rate" means the rate normally charged physicians who, like Dr. Hooper, have a heavy workload of high-risk patients. That rate was, at that time, $36,510.
Because the language of § 6(a) of the employment agreement — providing that if the premium for Dr. Hooper's professional-liability insurance exceeded the standard rate, Columbus would pay Dr. Hooper's insurer "that sum which is the insurer's standard premium rate for physicians in similar practices in Columbus, Georgia" — could support Dr. Hooper's position, there is a genuine issue of material fact as to what is the applicable "standard rate," and, thus, whether Columbus breached the employment agreement when it refused to pay the $36,510 Dr. Hooper alleges was the standard premium for a doctor with his workload and type of patients. Consequently, the trial court erred when it entered a summary judgment for Columbus on the breach-of-contract claim.
B. Wanton and Willful Conduct
"This Court has defined `wanton conduct':
 "`[The] doing of some act or something with reckless indifference to the consequences of said act, or . . . a failure or omission to do something, with reckless indifference to the consequences of such failure or omission, that is, that the party acting or failing to act is conscious of his conduct, and even though without any actual intent to injure is aware from his knowledge of existing circumstances and conditions that his conduct would probably result in injury to another or in damage to his property.'"
Armstrong Bus. Servs., Inc. v. AmSouth Bank,817 So.2d 665, 679-80 (Ala. 2001) (quoting Weatherly v. Hunter,510 So.2d 151, 152 (Ala. 1987), quoting in turn W.T. RatliffCo. v. Purvis, 292 Ala. 171, 176, 291 So.2d 289, 293
(1974)). "`Wantonness involves the "conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result."'" Ammons v. Tesker Mfg. Corp.,853 So.2d 210, 213 (Ala. 2002) (quoting Hobart Corp. v. Scoggins,776 So.2d 56, 58 (Ala. 2000)). "To constitute `willful or intentional injury,' there must be knowledge of danger accompanied with a design or purpose to inflict injury, whether the act be one of omission or commission." English v.Jacobs, 263 Ala. 376, 379, 82 So.2d 542, 545 (1955). *Page 1141 
Dr. Hooper's complaint included separate claims of willful and wanton conduct against Columbus at each of the two hospitals operated by it. To establish those claims, Dr. Hooper must prove that Columbus had a duty to refrain from causing him the alleged injury or damage and that Columbus breached that duty.Beard v. Mobile Press Register, Inc., 908 So.2d 932
(Ala.Civ.App. 2004); Ammons, supra.
Dr. Hooper proffered evidence indicating that Columbus sought to "blemish his record" and to prevent him from opening a medical practice in the Columbus, Georgia/Phenix City area. However, he failed to establish the existence of a duty toward him in this regard. He did not allege in his appeal that the "blemish" rose to the level of the tort of defamation, although he had included a defamation claim in his original complaint.
Nor did Dr. Hooper establish that Columbus's alleged efforts to prevent him from opening a medical practice violated any duty Columbus owed him. Ordinarily, a business has no duty to assist a competitor in establishing a competing business in the same geographical area and thereby undermine its own business.
We conclude that the trial court did not err in entering a summary judgment for Columbus on the claims alleging willful and wanton conduct, and we affirm the trial court's judgment as to those claims.
C. The Civil-Conspiracy Claim
"Civil conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." Keith v. Witt Auto Sales, Inc.,578 So.2d 1269, 1274 (Ala. 1991) (citing Eidson v. OlinCorp., 527 So.2d 1283 (Ala. 1988)). "The gist of an action alleging civil conspiracy is not the conspiracy itself but, rather, the wrong committed." 578 So.2d at 1274 (citingSadie v. Martin, 468 So.2d 162 (Ala. 1985)).
Columbus argues that it is well established that "`liability for civil conspiracy rests upon the existence of an underlying wrong and [that] if the underlying wrong provides no cause of action, then neither does the conspiracy.'" Ex parte AlabamaDep't of Transp., 764 So.2d 1263, 1271 (Ala. 2000) (quotingJones v. BP Oil Co., 632 So.2d 435, 439 (Ala. 1993)). Because the trial court entered a summary judgment for Columbus on the underlying wrongs, that is, on the breach-of-contract, wanton-misconduct, and willful-misconduct claims, Columbus argues, there remains no basis for the civil-conspiracy claim. However, this Court is reversing the summary judgment on the breach-of-contract claim. In Barber v. Stephenson,260 Ala. 151, 155, 69 So.2d 251, 254 (1954), this Court defined civil conspiracy as
 "the combination of two or more persons to do (a) something that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means."
Dr. Hooper has failed to establish that Columbus's alleged breach of contract was "unlawful, oppressive, or immoral," or was done by "unlawful, oppressive, or immoral means," as described in Barber. Nor has Dr. Hooper cited applicable caselaw to establish that a breach of contract similar to the breach he alleges by Columbus can be the underlying wrong upon which a civil conspiracy can rest. As this Court stated in Beachcroft Properties, LLP v. City ofAlabaster, 901 So.2d 703, 708 (Ala. 2004):
 "Rule 28(a)(10), Ala. R.App. P., requires the appellant to cite relevant authority in support of its arguments. This is so, because `"it is neither our *Page 1142 
duty nor function to perform all the legal research for an appellant."' Henderson v. Alabama A M Univ., 483 So.2d 392, 392 (Ala. 1986) (quoting Gibson v. Nix, 460 So.2d 1346, 1347
(Ala.Civ.App. 1984)). `Nor is it the function of the appellate courts to "make and address legal arguments for a party based on undelineated propositions not supported by sufficient authority or argument."' Pileri Indus., Inc. v. Consolidated Indus., Inc., 740 So.2d 1108, 1110 (Ala.Civ.App. 1999) (quoting Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala. 1994)). Authority supporting only `general propositions of law' does not constitute a sufficient argument for reversal. Geisenhoff v. Geisenhoff, 693 So.2d 489, 491 (Ala.Civ.App. 1997)."
Because Dr. Hooper has failed to demonstrate that civil conspiracy can be based upon a breach of contract as the underlying wrong, we do not address that claim. To the extent the summary judgment disposed of that claim, we affirm it.
 IV. Conclusion
For the foregoing reasons, we affirm the trial court's summary judgment with respect to the claims of willful and wanton conduct and the civil-conspiracy claim, but we reverse it with respect to the breach-of-contract claim, and we remand the case for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
NABERS, C.J., and SEE, HARWOOD, STUART, SMITH, and BOLIN, JJ., concur.
LYONS and WOODALL, JJ., concur in the result.