[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 21, 2008
THOMAS K. KAHN
CLERK

_____

No. 08-11029
Non-Argument Calendar

_____

D. C. Docket No. 06-01701-CV-H

CLIVE SAMUELS & ASSOCIATES, INC.,

                                                        Plaintiff-Appellee,

versus

BOXCAR FOODS, USA, INC.,

                                                        Defendant,

RETAIL GROUP SE, INC.,
JEROME D. HOFFMAN,

                                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(July 21, 2008)**

Before HULL, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

In this breach of contract action, defendants Retail Group, SE, Inc. ("Retail Group") and Jerome Hoffman ("Hoffman") (collectively, "Defendants") appeal from the district court's entry of summary judgment in favor of plaintiff Clive Samuels & Associates, Inc. ("CSA"). After review, we affirm in part and reverse in part.

## I. BACKGROUND

In September 2005, Hoffman, the CEO, CFO, president, and sole shareholder of Retail Group, approached CSA, an engineering firm, about design services for several retail stores to be known as "Boxcar" stores. Hoffman requested that CSA design, among other things, a refrigeration system for the Boxcar stores' food storage areas that would hold food products on carts located behind an air curtain system. The air curtain system would replace the doors typically used in food refrigeration units, eliminating the need for customers to open doors to access products. Hoffman believed that the system would reduce labor costs and integrate the process of handling products by allowing pallets of perishable food to be placed in position for selection without the need to manually restock traditional refrigeration units.

2

On October 9, 2005, CSA submitted a design proposal that incorporated the air curtain refrigeration system. On October 12, 2005, Hoffman sent a letter, on Retail Group letterhead, accepting CSA's proposal. The parties agree that the October 9 design proposal and October 12 letter constitute the contract at issue. Hoffman's October 12 letter stated, in pertinent part:

> Reference your proposal for Boxcar Foods USA Inc. dated October 9th, 2005, we hereby accept.
>
> Retail Group S.E. Inc. and Boxcar Foods USA Inc. hereby guarantee payment within ninety (90) days.
>
> As agreed upon, you will deliver the prototype engineering and specifications within eight weeks of today. And we will notify you accordingly what will be the first location.

Letter from Hoffman to CSA of Oct. 12, 2005.[1]

Although the original contract called for an air curtain system, at some point between October and December 2005, CSA recommended changing the design to include doors instead of the air curtain system. In December 2005, Hoffman personally approved CSA's recommended change to a more conventional refrigeration system, although Hoffman testified he "was forced to go along with"

---

[1] It is undisputed that Boxcar Foods USA Inc. is a non-existent entity. Boxcar Foods USA Inc. was originally named as a defendant in this action but was dismissed by the district court after the parties agreed that it did not exist. CSA discovered Boxcar Foods USA Inc.'s non-existence in discovery, and the district court gave CSA leave to amend its complaint to add the correct entity—alleged by defendant Hoffman to be an entity called Boxcar Foods, Inc.—but CSA declined to amend its complaint. Thus, the only remaining defendants are Hoffman and Retail Group.

the change because "we were so far into it with a number of stores and fighting a deadline." Deposition of Jerome Hoffman, at 99. According to Hoffman, CSA's change from the air curtain system to a more conventional system "wasn't the original contract, and [CSA] knew it." Id.

In any event, CSA ultimately provided six sets of drawings for six different Boxcar stores, and each set implemented conventional refrigeration systems.[2] Defendants used CSA's drawings in submissions to government planning offices in Birmingham, Cullman, and Tuscaloosa, Alabama; Salisbury and Greenville, North Carolina; and Conway, South Carolina.

Beginning in January 2006 and ending in July 2006, CSA submitted twenty-eight invoices to Hoffman, totaling $549,203.20. Defendants never paid a single invoice. Hoffman admitted that Defendants had neither cash nor a line of credit available to pay CSA's invoices. Instead, according to Hoffman, CSA understood that it would not be paid until a Boxcar store was sold and leased back. However, Hoffman's October 12, 2005, acceptance letter unambiguously states that "Retail Group S.E. Inc. and Boxcar Foods USA Inc. hereby guarantee payment within ninety (90) days." Letter from Hoffman to CSA of Oct. 12, 2005.

---

[2]Hoffman contends that the drawings were all the same.

In August 2006, CSA filed this lawsuit, alleging breach of contract[3] and asking that Retail Group's corporate form be disregarded so as to hold Hoffman personally liable for its breach. CSA moved for summary judgment, which the district court granted. The district court entered final judgment against Hoffman and Retail Group, jointly and severally, in the amount of $549,203.20. Hoffman and Retail Group appeal.[4]

## II. DISCUSSION

**A.    Contract terms**

Defendants first argue that the district court erred in determining that the contract was unambiguous. Under Alabama law, "[a]mbiguity in a contract precludes the trial court from entering a summary judgment." Whitetail Dev. Corp. v. Nickelson, 689 So. 2d 865, 867 (Ala. Civ. App. 1996).[5] "If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court and, when appropriate, may

---

[3]Federal jurisdiction exists pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).

[4]We review the district court's grant of summary judgment to CSA de novo and resolve all reasonable doubts about the facts in favor of the non-movants (Hoffman and Retail Group). See Van Voorhis v. Hillsborough County Bd. of County Comm'rs, 512 F.3d 1296, 1299 (11th Cir. 2008). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. See id.

[5]The district court applied Alabama law, and the parties agree that Alabama law governs this dispute. Accordingly, we apply Alabama law.

be decided by a summary judgment." McDonald v. U.S. Die Casting & Dev. Co., 585 So. 2d 853, 855 (Ala. 1991). If a contract is ambiguous, a court should first employ established rules of contract construction to try to resolve the ambiguities. Alfa Life Ins. Corp. v. Johnson, 822 So. 2d 400, 405 (Ala. 2001). "However, if the terms within the contract are [still] ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by a jury." McDonald, 585 So. 2d at 855; see Johnson, 822 So. 2d at 405 ("Where factual issues arise, the resolution of the ambiguity becomes a task for the jury."). Defendants argue that summary judgment was inappropriate because the contract contains at least three ambiguities that should have been resolved by a jury.[6]

First, the contract is not ambiguous as to whether it is for the design of one "store" as opposed to multiple "stores." The contract specifically provides that the "Fee . . . for the first prototype store, as detailed above, shall be $95,000," and that the "Fee . . . for the next five stores, as detailed above, shall be $340,000." Proposal of Oct. 9, 2005, at 8. As Defendants acknowledge, the "major portion of

_____

[6]In the district court, Defendants argued that there were eight ambiguities in the contract that rendered summary judgment inappropriate. On appeal, Defendants raise (and so we address) only three purported ambiguities. See United States v. Curtis, 380 F.3d 1308, 1310 (11th Cir. 2004) (noting the "long-standing rule in this circuit" that issues not raised in initial briefs on appeal are waived); see also United States v. Gupta, 463 F.3d 1182, 1195 (11th Cir. 2006) (stating that if a party fails to provide arguments on the merits of an issue and makes only passing reference to the issue in its briefs, the argument is waived), cert. denied, 127 S. Ct. 2446 (2007).

the contract" addresses work to be performed on multiple stores, and even Hoffman's acceptance letter indicates that the contract concerns multiple stores. Br. of Appellants at 11; Letter from Hoffman to CSA of Oct. 12, 2005 ("And we will notify you accordingly what will be the first location.") (emphasis added). Accordingly, the contract's isolated reference to a single "store" in its next-to-last sentence does not render the contract ambiguous, as the only reasonable interpretation of the contract is that it pertains to work to be performed on multiple stores. See State v. Lorillard Tobacco Co., __ So. 2d __, 2008 Ala. LEXIS 62, at *14 (Ala. Mar. 28, 2008) (noting that one rule of contract construction is that a court should construe a contract as a whole and that detached words standing alone are not controlling); see also Russell v. Garrett, 93 So. 711, 713 (Ala. 1922) (same).[7]

Second, the contract is not ambiguous on account of the fact that "there is no indication as to which stores were included within the scope of the contract." Br. of Appellants at 9. Although Defendants do not fully explain this assertion, their claim seems to be that because the contract indicates that CSA will bill Retail

---

[7]Additionally, the one-sentence reference to a single "store" is an obvious typographical error in a boilerplate conclusion sentence, particularly given that the same sentence includes a reference to CSA looking forward to working with "Fairway," an entity that apparently has nothing to do with this case or these parties. The next-to-last sentence of CSA's proposal states in full: "We look forward to working with Fairway [sic] in developing the engineering plans for this store." Proposal of Oct. 9, 2005, at 9.

Group at a lower rate after the first six stores are completed, CSA will be able to "cherry-pick" which stores it will place in the first group of six stores and which stores it will place in subsequent groups, so as to maximize its profits. Id. at 11.

The problem with this argument is that the contract unambiguously states that CSA will provide design services to Retail Group: (1) for one prototype store; (2) for five additional stores; and (3) for a refrigeration manufacturing facility in Greenville, South Carolina. Beyond that, the contract only "anticipate[s]" that further stores could be designed by CSA for a reduced cost and that identical stores could be provided at a further reduced fee. Proposal of Oct. 9, 2005, at 8. In other words, the contract does not impose additional obligations on CSA beyond its work on the first six stores and the Greenville facility. (Indeed, it is noteworthy that CSA actually provided Defendants with exactly six sets of drawings for six Boxcar stores.) Thus, the contract is not ambiguous as a result of its purported failure to indicate which stores were included within its scope.

However, we agree with Defendants that the contract is ambiguous as to whether it includes direct travel expenses. The contract lists various design and other services that are covered by the proposed fees for the stores. See Proposal of Oct. 9, 2005, at 8 (Section VIII: "Compensation") (noting that the "Fee for the Mechanical, Electrical, Plumbing and Refrigeration Engineering Design Services"

8

is to be $95,000 for the first store and $340,000 for the next five stores).  However,

the contract expressly excludes direct travel expenses from those proposed fees, as

follows:

VII.  EXCLUSIONS

1.  This proposal does not include any work involved with the
presence of asbestos or asbestos containing materials.
2.  All direct travel expenses.
3.  All meetings above and beyond those designated in this
proposal.
4.  Site safety and security conditions.
5.  Building structural systems and design.
6.  Modifications to existing fire sprinkler systems.

Id. at 7.

Despite this express exclusion of direct travel expenses, CSA argues—and

the district court found—that the contract unambiguously includes travel expenses.

According to CSA and the district court, the items listed as "Exclusions" can only

be reasonably interpreted as items that will be billed separately by CSA, above and

beyond the proposed fees listed in the contract.

While CSA's and the district court's interpretation is one reasonable

construction of the contract, it is not the only reasonable construction of the

contract.  Instead—given that "direct travel expenses" are listed under

"Exclusions"—the contract can also reasonably be read so as to exclude direct

travel expenses completely, which renders the contract ambiguous as to direct

travel expenses.  See McCollough v. Regions Bank, 955 So. 2d 405, 411 (Ala. 2006) (stating that a contract term is ambiguous if it is reasonably susceptible of more than one interpretation).  This is particularly so in light of the fact that travel expenses are not listed in a later portion of the contract that discusses certain "items and services [that] shall be deemed reimbursable expenses."  Proposal of Oct. 9, 2005, at 8 (emphasis added).  Although this list of "items and services [that] shall be deemed reimbursable expenses" is not necessarily reflective of every reimbursable expense between the parties, it is certainly notable that direct travel expenses are not listed thereunder, and their absence supports Defendants' contention that the contract is ambiguous as to direct travel expenses.  For these reasons, the district court erred in granting CSA summary judgment for the approximately $10,000 that it charged Defendants in direct travel expenses, and a jury must resolve the question of whether the contract includes those expenses.

**B.     Breach**

Defendants next argue that the district court erred in determining that CSA was entitled to summary judgment on the underlying breach of contract claim.  To establish its breach of contract claim, CSA must prove four elements: (1) a valid contract between the parties; (2) CSA's own performance under the contract; (3) Defendants' nonperformance under the contract; and (4) damages.  See Hooper v.

10

<u>Columbus Reg'l Healthcare Sys., Inc.</u>, 956 So. 2d 1135, 1139 (Ala. 2006).

Only the second element is in dispute here. According to Defendants, CSA cannot satisfy the second element because CSA never provided the air curtain refrigeration system originally in the contract. While Defendants acknowledge that they agreed to utilize a conventional refrigeration system due to time constraints, they argue that their agreement to use a conventional refrigeration system did not constitute an abandonment of their expectations for an air curtain system. Instead, Defendants contend that they still were entitled to receive an air curtain system, even after they agreed to allow CSA to provide a more conventional system.

This argument fails because Defendants' undisputed agreement to use a more conventional refrigeration system modified the contract between the parties. "[P]arties are free to modify agreements, and if the terms of a subsequent agreement contradict the earlier agreement, the terms of the later agreement prevail." <u>Cavalier Mfg., Inc. v. Clarke</u>, 862 So. 2d 634, 641 (Ala. 2003). Here, it is undisputed that as of December 2005, Hoffman agreed to have CSA proceed with Boxcar store designs that included conventional refrigeration systems. It is further undisputed that Defendants used CSA's designs—which included doors on refrigerated spaces, rather than air curtains—in submissions to six government planning offices. Accordingly, it is clear that the parties mutually agreed to modify

11

the contract to include a more conventional refrigeration system instead of an air curtain system, and that this change superseded the earlier agreement between the parties.[8]

Defendants further contend that any modification of the contract had to be supported by new consideration, and that here, there was no additional consideration given for the purported modification. However, Defendants failed to raise this "consideration" issue before the district court, and thus they have waived the argument. See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) (noting that this Court has repeatedly held that an issue not raised in the district court and raised for the first time on appeal is waived).[9] Accordingly, the district court correctly determined that CSA was entitled to

---

[8]Defendants seem to argue in passing that the contract was unilaterally modified by CSA (as opposed to modified by mutual agreement), and that unilateral modification is impermissible under Alabama law. Defendants are correct that a party "cannot unilaterally alter the terms of a contract after the contract has been made" and that "[b]oth parties must mutually assent to a modification." Ex parte Amoco Fabrics & Fibers Co., 729 So. 2d 336, 340 (Ala. 1998). However, the contract here was not unilaterally modified. Hoffman undisputedly agreed with CSA to have CSA proceed with designs that included conventional refrigeration systems instead of air curtain systems, even if he did so reluctantly.

Defendants also argue in passing that the contract was rendered ambiguous by the parties' alteration of the contract to allow CSA to include conventional food refrigeration systems. However, this contention is without merit because the parties modified the contract, thereby relieving CSA of any duties to provide designs that included air curtain refrigeration systems. The modification did not create ambiguity.

[9]In any event, the Alabama Supreme Court recently stated: "'Parties to a written contract may by mutual consent without other consideration orally alter, modify or rescind the contract.'" Cavalier Mfg., 862 So. 2d at 640-41 (emphasis added) (quoting Watson v. McGee, 348 So. 2d 461, 464 (Ala. 1977)).

12

summary judgment on its breach of contract claim.

## C.  Hoffman's personal liability

Finally, the district court did not err in concluding that Retail Group's corporate veil should be pierced so as to make Hoffman personally liable.

In order to pierce Retail Group's corporate veil, CSA must establish that: (1) Hoffman had complete control of Retail Group's finances, policy, and business practices so that at the time of the contract, Retail Group had no will or existence of its own; (2) Hoffman misused his control of Retail Group; and (3) Hoffman's misuse of control proximately caused CSA's loss. See Messick v. Moring, 514 So. 2d 892, 894-95 (Ala. 1987). As to the first element, "[t]he mere fact that a party owns a majority or all of the corporation's stock does not, of itself, destroy the corporate identity, but it is a factor to be considered in determining the control of the corporation." Id. at 895. As to the second element, "fraud or the violation of a statutory or other positive legal duty is misuse of control, [but] when it is necessary to prevent injustice or inequitable circumstances, misuse of control will be presumed." Id.

Here, all three elements are present. As to the first element, Hoffman owned all the stock of Retail Group and was its CEO, CFO, and president. While Hoffman's status as Retail Group's sole shareholder does not by itself establish his

13

"complete control and domination" over Retail Group, it is a factor to be considered. Id. at 894. Moreover, when asked if there were any other directors of Retail Group beyond himself, Hoffman first testified that he did not know. Deposition of Jerome Hoffman, at 17. Although Hoffman eventually named Aaron Arradondo as another director, when Hoffman was asked about Arradondo's responsibilities, he testified only that Arradondo was a "research analyst" whose duties were limited to studying the retail market for supermarkets and helping "develop the Boxcar concept." Id. at 17-18, 32-33. Hoffman mentioned no traditional officer responsibilities for Arradondo, further establishing that Hoffman exercised sole and complete control over Retail Group.

As to the second and third elements, the undisputed evidence establishes that Hoffman misused his control of Retail Group to obtain services from CSA and that his misuse caused CSA's loss. Hoffman's acceptance letter, written on Retail Group letterhead, expressly "guarantee[d]" payment to CSA from Retail Group and the non-existent Boxcar Foods USA Inc., see Letter from Hoffman to CSA of Oct. 12, 2005, and CSA relied on that guarantee and performed under the contract as later modified. Despite his written guarantee to pay CSA within ninety days, however, Hoffman admitted that he never intended to pay CSA until the Boxcar stores were built, sold, and leased back. Indeed, Hoffman admitted that neither he

14

nor Retail Group (nor, for that matter, Boxcar Foods USA Inc.) had cash or a line of credit available from a bank or any other source that would have enabled him to pay CSA even if he had chosen to do so.

Moreover, the fact that Hoffman contracted on behalf of a non-existent entity (Boxcar Foods USA Inc.) in addition to Retail Group is further evidence of Hoffman's subterfuge. And given that Retail Group's stock has no value and that Retail Group has no insurance with which to satisfy a judgment against it, Hoffman's misuse of control could even be presumed here in order to prevent injustice. See Cohen v. Williams, 318 So. 2d 279, 281 (Ala. 1975).

Accordingly, we cannot say that the district court erred in piercing Retail Group's corporate veil to hold Hoffman personally liable.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of CSA and against Defendants Hoffman and Retail Group except as to the approximately $10,000 in direct travel expenses. With regard to the travel expenses, we remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

15