SMITH, Justice.
These three appeals arise from an action Larry Rivers filed against Southeast Environmental Infrastructure, L.L.C. (“SEI”), and Metropolitan Gardens Developers, L.L.C., a joint venture consisting of Doster Construction Company, Inc., and Integral Building Group, L.L.C. (collectively “the joint venture”).

Facts and Procedural History

Rivers was injured on October 8, 2004, while he was working as an independent contractor with SEI at the “Hope VI” job site in Birmingham. The joint venture was the general contractor for the Hope VI project, and it had contracted with SEI to install water and sanitary sewer lines on the project.
At the time of his injury, Rivers was working with two employees of SEI, Robert Dawson and Melvin Butler, to install sanitary sewer pipes. Just before Rivers’s injury, Butler was using a trackhoe to lift an iron ductile pipe and move it into place in a trench in which Rivers was standing. According to Butler, Dawson had used a synthetic canvas strap to secure the pipe to the bucket of the trackhoe. As Butler maneuvered the trackhoe to move the pipe toward Rivers, the strap either slipped or broke between the pipe and the trackhoe, and the pipe struck Rivers in the head. Rivers suffered traumatic brain injury and other physical injuries; he was hospitalized for 21 days and incurred medical expenses of $207,000.
Rivers sued SEI and the joint venture, asserting, among other things, claims of negligence and wantonness and seeking compensatory and punitive damages. The joint venture filed a cross-claim against SEI, alleging breach of contract based on SEI’s failure to defend and indemnify the joint venture as well as its failure to provide insurance coverage for Rivers’s claims.
Before trial, the joint venture reached a pro tanto settlement with Rivers for $275,000. The joint venture and SEI agreed for the joint venture’s cross-claim to be tried without a jury. The joint venture and SEI also agreed that the trial court could adopt, for the trial of the cross-claim, the evidence presented in the jury trial of Rivers’s claims against SEI.
The jury returned a verdict against SEI after a five-day trial and awarded Rivers $1.1 million in compensatory damages and $400,000 in punitive damages, and the trial court entered a judgment on that verdict. The trial court then made written findings of fact and conclusions of law on the joint venture’s cross-claim against SEI and en *37 tered a judgment holding that the joint venture was entitled to indemnification from SEI for the $275,000 settlement with Rivers. The trial court also entered a judgment awarding certain costs and attorney fees to Rivers and the joint venture.
SEI filed a postjudgment motion for a judgment as a matter of law (“JML”) or, in the alternative, for a new trial. SEI also filed a motion for a remittitur of the compensatory- and punitive-damages awards and requested a hearing in accordance with the decisions of this Court in Hammond, v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). The trial court scheduled those motions to be heard on December 1, 2006. The day before that hearing, however, the trial court informed the parties that it was postponing that part of the hearing addressing SEI’s motion for a remittitur.
At the hearing on December 1, 2006, the trial court heard arguments regarding all postjudgment motions except the motion for a remittitur. Ten days later — without holding a hearing on SEI’s motion for a remittitur — the trial court entered an order denying SEI’s postjudgment motions for a JML, a new trial, and a remittitur.
Rivers then filed a motion requesting the trial court to set a hearing on SEI’s remittitur motion. Although it stated that it was not waiving its request for a hearing on the remittitur motion, SEI filed a response to Rivers’s motion arguing that the trial court did not have jurisdiction to hold a hearing on its remittitur motion because the court had already denied SEI’s post-judgment motions for a JML, a new trial, and a remittitur. On January 9, 2007, the trial court entered an order stating that SEI’s argument that the trial court did not have jurisdiction to hold a hearing on the remittitur motion was an attempt to delay the proceedings “for delay’s sake.” The trial court held that SEI either had waived its right to a hearing on its remittitur motion or had invited any error that resulted from the trial court’s not holding such a hearing.
SEI timely appealed from the judgment on Rivers’s claim (case no. 1060615), the judgment on the joint venture’s cross-claim (case no. 1060643), and the judgment awarding costs and attorney fees (case no. 1060876).

Discussion

Case No. 1060615 — Judgment on Rivers’s Negligence and Wantonness Claims

I.

SEI first challenges the sufficiency of the evidence Rivers offered in support of his negligence and wantonness claims. SEI argues that Rivers failed to present substantial evidence that SEI was negligent or wanton and that SEI’s negligence or wantonness proximately caused Rivers’s injury.
As noted, Rivers’s claims against SEI were tried before a jury, and the trial court denied SEI’s postjudgment motions for a JML and a new trial. In its post-judgment motions, SEI presented the same sufficiency-of-the-evidence challenges it now makes on appeal.
“ ‘In reviewing a jury verdict, an appellate court must consider the evidence in the light most favorable to the prevailing party .... ’ Delchamps, Inc. v. Bryant, 738 So.2d 824, 831 (Ala.1999). See also Cobb v. MacMillan Bloedel, Inc., 604 So.2d 344 (Ala.1992), and Mason & Dixon Lines, Inc. v. Byrd, 601 So.2d 68 (Ala.1992). A presumption of correctness attaches to a jury verdict, ‘if the verdict passes the “sufficiency test” presented by motions for directed verdict and a JNOV.’ S & W Properties, *38 Inc. v. American Motorists Ins. Co., 668 So.2d 529, 584 (Ala.1995). (Rule 50(a), Ala. R. Civ. P., now designates a motion for a directed verdict as a motion for a judgment as a matter of law, and Rule 50(b) now designates a motion for JNOV as a renewed motion for a judgment as a matter of law.) This presumption is strengthened by a trial court’s denial of a motion for a new trial. Christiansen v. Hall, 567 So.2d 1338 (Ala.1990). ‘This Court will not, on a sufficiency of the evidence basis, reverse a judgment based on a jury verdict unless the evidence, when viewed in a light most favorable to the [verdict winner], shows that the verdict was “plainly and palpably wrong and unjust.” ’ S &W Properties, 668 So.2d at 534 (quoting Christiansen, 567 So.2d at 1341). “Whether to grant or deny a motion for new trial rests within the sound discretion of the trial court, and this Court will not reverse a ruling in that regard unless it finds that the trial court’s ruling constituted an abuse of that discretion.’ Colbert County-Northwest Alabama Healthcare Authority v. Nix, 678 So.2d 719, 722 (Ala.1995). ‘Without a showing of such an abuse, the trial court’s ruling must be affirmed.’ Id.”
Liberty Nat’l Life Ins. Co. v. Sanders, 792 So.2d 1069, 1072 (Ala.2000).
A
SEI argues that to show that SEI was negligent Rivers was required to present substantial evidence showing (1) that the synthetic canvas strap holding the iron pipe while it was being moved broke, and (2) that the strap, before it broke, “was visibly worn or frayed such that it was unreasonable for SEI to use it to lift the pipe on the day of the accident.” (SEI’s brief, p. 23.)

1.

We first address SEI’s contention that there was not substantial evidence showing that the strap broke while Butler was lifting the pipe with the track-hoe.
“The definition of ‘substantial evidence’ is well settled:
“ ‘ “ ‘Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).” ’
“Lincoln Log Home Enters., Inc. v. Autrey, 836 So.2d 804, 805 (Ala.2002) (quoting Fleetwood Enters., Inc. v. Hutcheson, 791 So.2d 920, 923 (Ala.2000)).”
Ex parte Williamson, 907 So.2d 407, 414-15 (Ala.2004).
Geral Moss, who worked for the joint venture, testified that he arrived at the job site as the ambulance was transporting Rivers to the hospital. He testified that he inspected the scene and that he saw “a broken strap in the ditch” Rivers was in when he was injured. Moss stated that when he sáw the broken strap it was attached “probably midway of the piece of pipe that had fallen” and that the strap “had the frayed ends on it.”
SEI claims that Moss’s testimony cannot be considered as substantial evidence that the strap broke while the pipe was being moved, because Moss later testified as follows:
“Q. Let me ask you this, Mr. Moss. Are you able to swear to this jury that that strap that you saw in the ditch after the accident was the strap involved in the accident?
“A. No, I cannot tell you that, no.”
*39 Moss also testified, however, (1) that he saw a broken strap in the trench; (2) that that strap was attached to the middle of the pipe where, based on his experience, he would expect to see the strap placed; (3) that the pipe and the strap were in the ditch where the accident occurred; and (4) that the broken strap attached to the pipe was the only pipe strap of any kind that he saw at the accident scene. Viewing Moss’s testimony in a light most favorable to Rivers, as the standard of review requires, we ■ conclude that Moss’s testimony provided substantial evidence that the strap broke, even though Moss indeed testified that he was not certain that the broken strap he saw in the ditch was the strap that had been used to move the pipe that injured Rivers.
Additional evidence indicating that the strap broke while the pipe was being moved was provided in a statement attributed to Dawson. Dawson did not testify at trial, but his statement was contained in an incident report prepared by Moss. Moss prepared the report after the accident at the instruction of his supervisor, Jacques Edwards. Moss testified that preparing such a report was standard procedure for the joint venture, that it was standard procedure in completing an incident report to interview any witnesses to the accident, and that he interviewed Dawson and Butler, both of whom were still at the scene when Moss arrived.
Moss testified that he interviewed Dawson approximately 15 or 20 minutes after the accident. Because Moss did not have with him the standard incident-report form used by the joint venture, he summarized Dawson’s account of the accident on a sheet of paper and had Dawson sign his name below the summary.
After completing Dawson’s, interview, Moss interviewed Butler and asked Butler to review the report that Dawson had signed. Butler asked Moss to cross out that part of the statement attributed to Dawson that said, “the strap broke.” Butler told Moss that the strap had not broken but that the pipe had shifted. Moss changed the report to reflect Butler’s account of the accident, and Butler signed his name below the statement. Moss testified that he then took the report back to Dawson for his review and that Dawson printed his name below the revised statement. The next morning, Moss transferred the information to the proper incident-report form and gave it to Edwards.
SEI objected at trial to the admission of that portion of the incident report containing Dawson’s statement that the strap broke, and SEI raised that objection in its motion for a new trial, thereby preserving it for appellate review. On appeal SEI contends that the trial court committed reversible error by admitting Dawson’s statement, which SEI contends was inadmissible hearsay.
“Two fundamental principles govern the standard by which this Court reviews a trial court’s rulings on the admission of evidence. Middleton v. Lightfoot, 885 So.2d 111, 118 (Ala.2003). ““The first grants trial judges wide discretion to exclude or admit evidence.’”’ 885 So.2d at 113 (quoting Mock v. Allen, 783 So.2d 828, 835 (Ala. 2000), quoting in turn Wal-Mart Stores, Inc. v. Thompson, 726 So.2d 651, 655 (Ala.1998)). However, ‘a trial court exceeds its discretion where it admits prejudicial evidence that has no probative value.’ 885 So.2d at 113 (citing Powell v. State, 796 So.2d 404, 419 (Ala.Crim. App.1999), aff'd, 796 So.2d 434 (Ala. 2001)).
“ ‘ “ ‘The second principle “is that a judgment cannot be reversed on appeal for an error [in the improper admission of evidence] unless ... it should appear *40 that the error complained of has probably injuriously affected substantial rights of the parties.” ’ ” ’ Middleton, 885 So.2d at 113 (quoting Mock, 783 So.2d at 835, quoting in turn Wal-Mart Stores, 726 So.2d at 655). See also Rule 45, Ala. R.App. P. ‘ “The burden of establishing that an erroneous ruling was prejudicial is on the appellant.” ’ Middleton, 885 So.2d at 113-14 (quoting Preferred Risk Mut. Ins. Co. v. Ryan, 589 So .2d 165, 167 (Ala.1991)).”
Baldwin County Elec. Membership Corp. v. City of Fairhope, 999 So.2d 448, 453 (Ala.2008).
In support of the trial court’s admission of that part of the incident report containing Dawson’s statement that the strap broke, Rivers offers several arguments, including that Dawson’s statement was an admission by a party opponent under Rule 801(d)(2), Ala. R. Evid.[1] Rule 801(c), Ala. R. Evid., defines hearsay as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” However, Rule 801(d)(2) excludes from the definition of hearsay certain admissions by a party opponent.
SEI contends that Dawson was not a party to Rivers’s action and, therefore, SEI argues, Dawson’s statement was not an admission by a party opponent. However, Rule 801(d)(2)(D) includes as an admission by a party opponent “a statement by the party’s agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship” (emphasis added). It is undisputed that Dawson was an employee of SEI when he allegedly made the statement to Moss. Moreover, SEI’s contract with the joint venture required Dawson to report the accident to the joint venture, and SEI was also required to provide the joint venture with a report of the accident.[2] Thus, Dawson was acting within the scope of his employment when he allegedly told Moss that the strap broke while the pipe was being moved, and the statement was admissible under Rule 801(d)(2), Ala. R. Evid. See New Plan Realty Trust v. Morgan, 792 So.2d 351, 361-62 (Ala.2000); Sartin v. Madden, 955 So.2d 1024, 1029 (Ala.Civ.App.2006). See also Charles W. Gamble, Gamble’s Alabama Rules of Evidence § 801(d)(2) (2d ed. • 2002) (“[T]he statement of a party’s agent may be vicariously admitted against the party because it was either within the line and scope of the agent’s authority to speak or the subject of the statement was within the scope of the agent’s authority.” (footnotes omitted)). Consequently, SEI has not shown that the trial court exceeded its discretion in admitting Dawson’s statement, and that statement, in addition to Moss’s testimony that he saw a broken strap in the ditch where Rivers was injured, provides substantial evidence that the strap used to move the pipe that struck Rivers broke.

*41
2.

As to the condition of the strap used to move the pipe that injured Rivers, SEI points out that Butler and Rivers were the only eyewitnesses to the accident who testified at trial.[3] According to SEI, Butler testified that the strap was a newer strap, and, SEI contends, Rivers testified that the strap appeared to be fit for use. SEI argues therefore that there was not substantial evidence from which the jury could conclude that the strap used to move the pipe was visibly worn or frayed before Rivers’s injury. We disagree.
Rivers’s alleged admission that he “felt comfortable using” the strap on the day of the accident was also accompanied by his testimony that he did not remember anything about the accident. Moreover, contrary to SEI’s contention, the portions of Butler’s testimony SEI cites do not establish that the strap was a “newer” strap. Indeed, those portions of Butler’s testimony make no reference to the condition of the strap that was being used to move the pipe at the time of Rivers’s injury. Butler testified only that the strap being used at the time of the accident “was not the first strap that [SEI] had on this site”; he stated that another strap had also been used on the job but that that strap had been confiscated by the joint venture because it was worn and frayed. According to Butler, the strap confiscated by the joint venture was not in use at the time it was confiscated.[4]
At most, Butler’s testimony “establishes” that “SEI had previously used another strap on the job, and the strap at issue [i.e., the one being used when Rivers was injured] was used afterwards.” (SEI’s reply brief, p. 5.) Although it might have been permissible for the jury to infer based on that testimony that the strap used on the day of the accident was a “newer” strap, Butler also testified that the strap being used at the time Rivers was injured “wasn’t new.”[5]
Moreover, apart from Rivers’s and Butler’s testimony, there was the testimony of Charles Isbell, an expert on OSHA regulations, specifically as applied to trenching operations. Isbell testified that, even if Butler’s testimony were true and the pipe slipped out of the strap, SEI would have been in violation of OSHA safety regulations. According to Isbell, a properly rigged pipe would not have slipped out of the strap.
The pipe that struck Rivers weighed between 400 and 600 pounds. Isbell testified that the strap that was used to lift the pipe should have had a rated lifting capacity of 2,400 pounds and an actual lifting capacity of 12,000 pounds and that a properly rated strap would not have broken lifting a 400-600 pound pipe unless the strap was not in a good condition. Isbell’s testimony in that regard provided substantial evidence suggesting either that SEI used a strap that was improperly rated for the pipe being lifted or that the strap was properly rated but was in an obviously unsafe condition. Under either scenario, according to Isbell, SEI violated OSHA safety regulations.
There was also evidence showing that SEI, despite the fact that it was instructed by Moss not to remove anything from the accident scene, took the strap from the *42 scene and never produced it for Rivers during discovery or at trial. Drew Brown, a superintendent for the joint venture, testified that he arrived at the accident scene about one hour after Rivers was injured. He inspected the scene and took photographs of it; however, he was unable to locate the strap that had been used to secure the pipe that injured Rivers.
The accident scene was taped off by Moss, Butler, Dawson, Edwards, and Edwards’s supervisor Ray Ladu. Moss, at the direction of the Birmingham Police Department, left instructions that the scene not be disturbed. However, Butler testified that, at some point after the accident had occurred, Dawson removed the strap from the pipe, put it on a trailer belonging to SEI, and took it to SEI’s offices.
The injury to Rivers occurred on a Friday, and Brown testified that on Monday after the incident he was informed by either Butler or Edmond Watters, the owner of SEI, that an employee of SEI had taken the strap from the scene and that the strap could not be located. In subsequent conversations with representatives of SEI, Brown was told that the strap was either at another job site or that it could not be located.
Before filing the present action, Rivers filed a petition for pre-action discovery under Rule 27, Ala. R. Civ. P. The petition requested that SEI produce the strap that had been used on the date Rivers was injured. In response to the court’s order granting that petition, Watters produced a black, “continuous-loop” strap[6] and stated that it was the strap that had been used on the date of the accident. However, Wat-ters later testified that he did not know whether the black strap was the strap involved in the accident, and no strap was offered into evidence at trial.
At trial, there was substantial evidence showing that SEI used only “eye-to-eye” or “double-loop” straps[7] on the Hope VI job site rather than a continuous-loop strap. Jeremy Busby, a field supervisor for the joint venture, testified that he observed SEI working almost fevery time SEI was on the job site and that he never saw SEI use a continuous-loop strap to lift pipes. Before Rivers’s injury, Busby observed SEI using a yellow double-loop strap attached to a trackhoe to lift ductile iron sewer pipe. On one occasion, Busby noticed that the strap lifting the pipe was frayed and in a bad condition; he talked to Butler on that occasion and confiscated that strap.
Brown confirmed that Busby had confiscated a yellow double-loop strap. Brown testified that the strap Busby had confiscated was in a terrible condition and needed to be taken out of service. Brown also testified that he never saw SEI use a continuous-loop strap on the Hope VI project site. Brown’s and Busby’s testimony on those points contradicted Butler’s testimony. In particular, Butler testified that SEI had not used a double-loop strap on the Hope VI project.
Thus, there was substantial evidence contradicting Butler’s testimony as to the type and condition of the strap being used at the time of the accident, and there was substantial evidence showing that the strap then being used was in a visibly unsafe condition before the accident. Additionally, as to SEI’s failure to produce the strap for Rivers or at trial, the trial court, at Rivers’s request, instructed the jury as to spoliation of evidence.
*43 The spoliation charge given to the jury was a variation of the charge in Alabama Pattern Jury Instructions — Civil (“APJI”) 15.12 (2d ed. Supp.2007).[8] That charge allowed the jury to consider spoliation in regard to its “deliberations concerning the validity of the defendant’s defense and claims.” SEI argues, however, that APJI 15.12 was the “wrong” charge for allowing the jury to consider spoliation as an inference of negligence or wantonness.
Instead, SEI contends that the “appropriate” charge was APJI 15.13,[9] which allows the jury to consider spoliation “as an inference of defendant’s guilt, culpability, or awareness of the defendant’s negligence.”
The standard for reviewing a trial court’s charge to the jury is as follows:
“ ‘In a jury case, a party is entitled to have its case tried to a jury that is given the appropriate standard by which to reach its decision, and a wrongful refusal of a requested jury charge constitutes a ground for a new trial. See, C.I.T. Financial Services, Inc. v. Bowler, 537 So.2d 4 (Ala.1988). An incorrect, misleading, erroneous, or prejudicial charge may form the basis for granting a new trial. See, Nunn v. Whitworth, 545 So.2d 766 (Ala.1989). However, the refusal of a requested, written instruction, although a correct statement of the law, is not cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the trial court’s oral charge. See, Rule 51, Ala. R. Civ. P. When examining a charge asserted to be erroneous, this Court looks to the entirety of the charge to see if there is reversible error. See, Grayco Resources, Inc. v. Poole, 500 So.2d 1030 (Ala.1986).’ ”
Cackowski v. Wah-Mart Stores, Inc., 767 So.2d 319, 327 (Ala.2000) (quoting Shoals Ford, Inc. v. Clardy, 588 So.2d 879, 883 (Ala.1991)). Additionally, “[a]ny error or defect which does not affect the substantial rights of the parties may be disregarded.” Bishop v. State Auto. Mut. Ins. Co., 600 So.2d 262, 265 (Ala.Civ.App.1991) (citing Rule 61, Ala. R. Civ. P.). As a result, the *44 jury instruction must be erroneous as well as prejudicial, and this Court cannot presume prejudice. Brabner v. Canton, 611 So.2d 1016, 1018 (Ala.1992); Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991). The appellant has the burden of demonstrating that an erroneous jury instruction was prejudicial. See Ryan, 589 So.2d at 167 (citing Dinmark v. Farrier, 510 So.2d 819 (Ala.1987)).
SEI has not established that the spoliation charge was prejudicial to it. SEI contends that the only way the jury could have made a finding of negligence was by inference from spoliation; therefore, SEI argues that, without the allegedly improper spoliation charge, there is a “gap” in the evidence presented by Rivers. As set out in the preceding sections, however, there is substantial evidence indicating both that the strap broke while the pipe was being lifted and that the strap was improperly rigged or was in a visibly unsafe condition at the time of the accident.
Moreover, the charge given by the trial court provided that, if the jury believed SEI was guilty of hiding or destroying the strap, the jury could consider that fact when considering the validity of SEI’s claims and defenses. SEI’s defenses in this case included its contention that the strap did not break and that the accident was caused when Rivers lost his balance and not by any negligence or wantonness on SEI’s part. If the jury, as instructed by the court, determined that SEI had hidden or destroyed the strap and that its defenses therefore should not be believed, the jury could then infer that the strap in fact broke as a result of its obviously poor condition and that Rivers did not cause the accident. Given that finding, the jury would have had sufficient evidence to find that SEI’s negligent or wanton conduct caused Rivers’s injuries.
More importantly, before the addition of the spoliation charges to the second edition of the API I, juries were allowed to infer, where the evidence at trial established that other evidence had been spoliated, that a defendant who spoliated evidence did so in an attempt to conceal the defendant’s own culpable conduct. See, e.g., May v. Moore, 424 So.2d 596, 603 (Ala.1982), in which this Court held:
“Proof may be made concerning a party purposefully and wrongfully destroying a document which he knew was supportive of the interest of his opponent, whether or not an action involving such interest was pending at the time of the destruction. See Gamble, McElroy’s Alabama Evidence, § 190.05 (3d ed.1977). Additionally, the spoliation, or attempt to suppress material evidence by a party to a suit, favorable to an adversary, is sufficient foundation for an inference of his guilt or negligence. Southern Home Insurance Co. of the Carolinas v. Boatwright, 231 Ala. 198, 164 So. 102 (1935); see also, Gamble, McElroy’s Alabama Evidence, § 190.02 (3d ed.1977).”
See also Charles W. Gamble, McElroy’s Alabama Evidence § 190.02(1) (5th ed. 1996) (“The general rule is that a party’s attempt to suppress evidence is admissible against that party. It is held to be relevant to show a consciousness of guilt or liability. Testimony of this nature is admissible as an implied admission of a party’s guilt or negligence. Such is considered to be in the category of an implied admission from conduct.” (footnotes omitted)).
The jury in this case was given not only the spoliation charge cited by SEI, but also charges on drawing reasonable inferences from the facts. The authorities cited above demonstrate that when there is evidence indicating that a *45 defendant has spoliated essential evidence in a case, it is reasonable for the jury to infer that the defendant did so to prevent anyone from seeing that evidence. Thus, where the evidence shows spoliation, the jury may consider the defendant’s spoliation of the evidence as an implied admission of culpability.
In the present case, there was testimony from Butler, SEI’s foreman at the Hope VI job site, that SEI removed the strap from the accident scene within an hour after the accident, despite the fact that the Birmingham Police Department told people at the scene that the scene should not be disturbed.[10] In response to Rivers’s request under Rule 27, Ala. R. Civ. P., that SEI produce the strap, Wat-ters produced a black, continuous-loop strap. However, SEI did not offer that strap into evidence at trial, and Watters testified that he had no personal knowledge of whether that strap was in fact the one that had been involved in the accident in which Rivers was injured. Moreover, there was evidence at trial suggesting that the strap being used at the time of the accident was a yellow double-loop strap. This evidence allowed the jury to infer that SEI had concealed or destroyed the strap and that it did so because the strap was broken and worn to such an extent that it was in an obviously unsafe condition.
In sum, in addition to the evidence in this case indicating that the strap broke, causing the pipe to hit Rivers, and that the strap was in a bad condition before it broke, there was substantial evidence indicating that SEI spoliated evidence, and the jury could consider SEI’s conduct in spoli-ating the evidence as an implied admission by SEI that its culpable conduct caused Rivers’s injuries. Consequently, SEI was not entitled to a JML on Rivers’s negligence claims.

B.

SEI also contends that Rivers did not offer substantial evidence that its conduct was wanton.
“ ‘The Legislature has defined “wantonness” as “[cjonduct which is carried on with a reckless or conscious disregard of the rights or safety of others.” Ala.Code 1975, § 6-ll-20(b)(3).’ Hobart Corp. v. Scoggins, 776 So.2d 56, 58 (Ala.2000). ‘Wantonness involves the “conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result.’” Id. (quoting Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256 (Ala. 1998)) (emphasis added in Scoggins). Thus, ‘[t]he “knowledge” of the defendant is “the sine qua non of wantonness.” ’ Norris v. City of Montgomery, 821 So.2d 149, 156 n. 9 (Ala.2001) (quoting Ricketts v. Norfolk Southern Ry., 686 So.2d 1100, 1106 (Ala.1996)).”
Ammons v. Tesker Mfg. Corp., 853 So.2d 210, 213 (Ala.2002).
SEI makes the following argument with regard to wantonness:
“[A]s discussed [in that section of SEI’s brief addressing Rivers’s negligence claims], there is no evidence, much less substantial evidence that SEI breached any duty when it used the strap at issue. And there certainly is no evidence that the strap was used with reckless disre *46 gard of the safety of [Rivers], or with the conscious understanding that injury to [Rivers] would likely follow.”
(SEI’s brief, p. 31.)
As discussed, SEI’s contention that there was not substantial evidence of negligence on its part is unavailing. Similarly unavailing is SEI’s argument that there was not substantial evidence of wantonness on its part.
In Lance, Inc. v. Ramanauslcas, 731 So.2d 1204 (Ala.1999), a 10-year-old child had been electrocuted when he attempted to get a snack out of an electric vending machine owned and maintained by Lance, Inc. 731 So.2d at 1207. Lance’s employees had plugged the vending machine into an ungrounded outlet. After reviewing the evidence presented in that case, this Court concluded that there was sufficient evidence to send the issue of wantonness to the jury:
“The evidence before the jury included testimony from a vice president of sales administration of Lance, Inc., that Lance was aware, as early as 1979, of the significance of the shocking hazard of its vending machines. This awareness prompted Lance to reduce the voltage in certain parts of its vending machines. ...
“The parents also submitted expert testimony describing the concept of grounding and stating that the possibility of injuries from ungrounded equipment was ‘well known.’ The parents’ expert testified that an abundance of literature on the necessity of grounding electrical equipment exists and that anyone in the business of installing electrical equipment would know to ensure that its equipment is properly grounded. The same expert testified that it would be ‘unsafe’ for Lance to assume that electric receptacles in older buildings such as the Clanton Holiday Inn were properly grounded and that Lance should have known to test the receptacle to determine whether it was properly grounded. The parents’ expert also testified that Lance could have used a $5 tester to determine whether the outlet was grounded. Lance’s employees, however, stated that they never used such a tester, and its routemen were not equipped with or trained to use such a tester. Our analysis of the foreseeability issue is also informed by the content of Lance’s safety manual, which clearly required the installer to verify that the machine is grounded.
[[Image here]]
“... We find the critical question to be whether it knew the necessity for testing electrical receptacles to which its vending machines are connected for adequate grounding at facilities such as the motel where this death occurred. As previously noted, the evidence of Lance’s practices before the child’s death, when coupled with the contents of Lance’s safety manual and the expert opinion testimony concerning foreseeability, was sufficient to show circumstances from which one could reasonably infer such knowledge. See Hamme v. CSX Transp., Inc., 621 So.2d 281, 283 (Ala.1993) (stating that to show wantonness ‘[t]he actor’s knowledge may be proved by showing circumstances from which the fact of knowledge is a reasonable inference’). We therefore hold that the trial court properly presented to the jury the question whether Lance was guilty of ‘[e]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others.’ Ala.Code 1975, § 6 — 11—20(b)(3).”
731 So.2d at 1210-12.
In the present case, Rivers offered the expert testimony of Isbell, who testified that his investigation and review of the *47 photographs of the accident scene taken on the day of the accident revealed numerous violations of OSHA safety regulations at the scene.[11] He offered the following testimony regarding those violations:
“As an experienced compliance officer, and I feel like I am pretty experienced after the number of inspections I have conducted ..., when you see that many violations, you see a breakdown in safety. When you see a breakdown in safety, that means you get lax in your performance of your job. Then it will lead to accidents. That’s a proven fact.”
(Emphasis added.)
Additionally, Butler testified that he had been trained regarding the proper methods for trenching and excavation and that he was familiar with the relevant OSHA regulations. He stated that he knew that the regulations and methods were used to help prevent accidents.
Butler testified that he understood the dangers and risks of working with unsafe pipe-rigging equipment and that using unsafe rigging equipment will cause “[w]hat-ever you are picking up [to] fall.” Butler testified that, despite that knowledge, he did not know and had never checked the weight of the pipes they were lifting on the day of the accident. He also never looked at the information printed on the pipe strap itself to check its rated lifting capacity. He further testified that his practice was to put the strap on the pipe and then to lift it. He stated that if the strap holds, then the strap is fine, but he testified he “ain’t looked at the weight on the strap or nothing like that if you want me to know.”
There was also evidence indicating that SEI had had other safety violations earlier in the Hope VI project, which tends to show that SEI had knowledge regarding the use of proper rigging equipment and proper trenching and excavation safety. Brown testified that the joint venture had had problems with SEI not properly barricading its trenches. He also testified that before Rivers’s accident, SEI once had a man in a 12-to-13-foot-deep trench on the Hope VT job site and the trench was not properly sloped, benched, or shored. Brown ordered the man to get out of the trench and then required SEI to dig the trench properly.
Finally, Busby testified that, before Rivers’s injury, he saw SEI laying pipe and the man in the trench was using a strap that was obviously unsafe and dangerous. Busby made SEI put the pipe down, and he confiscated the strap. Several people saw the strap, and witnesses at trial described it as being in such a bad condition that it should not have been used for any rigging operation. As noted, there was evidence suggesting that the confiscated strap was a yellow double-loop strap that was being used by SEI to lift ductile iron sewer pipe, the same type of pipe being lifted on the day of the accident.
This evidence, from both before the accident and on the day of the accident, was sufficient for the jury to conclude that SEI’s employees had knowledge of proper safety procedures for rigging and excava *48 tion but knowingly disregarded those safety rules and regulations while knowing that injury would likely result. Moreover, the evidence indicating that SEI had removed the strap from the accident scene and could not produce it when requested provided additional evidence of SEI’s culpability. Consequently, the trial court did not err in denying SEI’s motion for a JML to the extent SEI argued that there was not substantial evidence of wantonness by SEI.
II.
SEI next challenges the award of punitive damages.

A.

SEI first argues that the entire punitive-damages award must be stricken because, SEI contends, Rivers failed to prove wantonness by clear and convincing evidence. We disagree.
Section 6-ll-20(a), Ala.Code 1975, provides:
“Punitive damages may not be awarded in any civil action, except civil actions for wrongful death pursuant to Sections 6-5-391 and 6-5-410, other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff.”
“Clear and convincing evidence” is defined at § 6-ll-20(b), Ala.Code 1975, as:
“Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.”
The evidence of SEI’s wantonness is set forth in Part I.B. of this opinion. Without restating all of that evidence, we note that SEI did not offer expert testimony to contradict Isbell’s expert testimony. Moreover, it is undisputed that Butler knew the dangers of using unsafe rigging equipment, that he did not know and had never checked the weight of the pipes that were being lifted on the day of the accident, and that he never looked at the information printed on the pipe strap itself to check its rated lifting capacity. Finally, there was evidence indicating that, on an occasion before Rivers’s injury, the joint venture had stopped SEI from using a strap that was obviously unsafe and dangerous. All of that evidence, in conjunction with the evidence of SEI’s spoliation, provided clear and convincing evidence of wantonness. Accordingly, the trial court did not err in refusing to strike the entire punitive-damages award.

B.

SEI next argues that the trial court erred in denying its motion for a remittitur as to the punitive damages without holding a hearing on that motion.[12] As noted, SEI filed a motion for a remittitur and requested a hearing in accordance with the decisions of this Court in Hammond, supra, and &>"een Oil, supra. The trial court *49 scheduled those motions to be heard on December 1, 2006, but the day before that hearing the trial court informed the parties that it would not have the time on December 1 to conduct a hearing on SEI’s motion for a remittitur. Instead, the trial court told the parties that all other post-judgment motions would be considered on December 1, 2006, and that it would reschedule a hearing on SEI’s motion for a remittitur.
Ten days after the December 1, 2006, hearing, the trial court entered an order denying SEI’s postjudgment motions for a new trial, a JML, and a remittitur. Rivers then filed a motion for the court to hold a hearing on SEI’s remittitur motion, but SEI argued that the trial court’s denial of the postjudgment motions left the trial court without jurisdiction to hold a hearing on the remittitur motion. SEI contended that, because the trial court did not have jurisdiction, SEI’s only remedy was to appeal the denial of the motion for a remitti-tur and then have the cause remanded for a hearing. The trial court, however, rejected SEI’s arguments, describing them as an attempt to delay the proceeding “for delay’s sake,” and the trial court held that SEI either had waived its right to a hearing on the motion for a remittitur or had invited any error that resulted from not having such a hearing.
We agree with SEI. After the trial court denied the postjudgment motions on December 11, 2006, it lost jurisdiction to “reconsider” those postjudgment motions. In Ex parte Allstate Life Ins. Co., 741 So.2d 1066, 1070 (Ala.1999), this Court stated:
“ ‘[T]he Rules of Civil Procedure do not authorize a movant to file a motion to reconsider the trial judge’s ruling on his own post-judgment motion. However, in some cases such successive post-judgment motions may be permitted. If, for example, the judge has rendered a new judgment pursuant to a Rule 59(e) motion to alter, amend, or vacate a judgment or pursuant to a Rule 50(b) motion for judgment notwithstanding the verdict [now renamed as a renewed motion for a judgment as a matter of law], the party aggrieved by the new judgment may have had no reason to make such a motion earlier. In the usual case, after a post-judgment motion has been denied, the only review of that denial is by appeal; a judge has no jurisdiction to “reconsider” the denial.’
“[Ex parte Dowling,] 477 So.2d [400,] 404 [ (Ala.1985) ]. See also Ex parte Mutual Savings Life Ins. Co., [765 So.2d 649 (Ala.1998) ]. The exceptions mentioned in that excerpt from Dowling (exceptions to the rule of not allowing a trial judge to reconsider a denial of a post-judgment motion) are not applicable in the situation now before us.
“The Dowling Court also wrote: ‘The denial of a motion under Rule 59 or Rule 60 is usually appealable. That avenue, then, should be pursued by an aggrieved party. A motion to reconsider cannot be used as a substitute for an appeal.’ 477 So.2d at 403-04. This Court has clearly warned the bench and the bar not to attempt to use a Rule 59 or Rule 60 motion as a substitute for an appeal. ‘In view of the fact that this ease presents to us that situation, we take this opportunity to point out to the bench and bar that the Rules of Civil Procedure do not authorize a movant to file a motion to reconsider the trial judge’s ruling on his own post-judgment motion.’ 477 So.2d at 404. Just recently, this Court has reiterated: ‘[I]f a party has his own post-judgment motion denied, the review of that denial is by appeal. The rules do *50 not provide for a “motion to reconsider” the denial of one’s own post-judgment motion.’ Ex parte Mutual Savings Life Ins. Co., [765 So.2d at 651].
“The Court of Civil Appeals has also stated that the rule that a trial court cannot entertain a motion to ‘reconsider’ its previous order denying a post-judgment motion is more than a mere ‘technicality[1] under the Alabama Rules of Civil Procedure, but is based on the court’s loss of jurisdiction over the case. Package Express Center, Inc. v. Motley, 717 So.2d 378 (Ala.Civ.App.1998).”
See also Pinkerton Sec. & Investigation Sews., Inc. v. Chamblee, 961 So.2d 97, 101-02 (Ala.2006), in which this Court stated:
“A motion to reconsider the trial court’s denial of a postjudgment motion is barred because after the denial the trial court loses jurisdiction over the action. Ex parte Allstate Life Ins. Co., 741 So.2d 1066, 1070 (Ala.1999); see also Ex parte Jordan, 779 So.2d 183, 184 (Ala. 2000); Ex parte Vaughan, 539 So.2d 1060, 1061 (Ala.1989); [Ex parte] Dowling, 477 So.2d [400] at 404 [ (Ala.1985) ].
“Thus, ‘ “when a post-judgment motion is denied, the review of that denial is by appeal, not by a motion to reconsider.” ’ Ex parte Mutual Sav. Life Ins. Co., 765 So.2d 649, 651 (Ala.1998) (quoting McAlister v. Deatherage, 523 So.2d 387, 389 (Ala.1988)).”
Accordingly, SEI was correct in arguing that, after its December 11, 2006, order denying the postjudgment motions, the trial court did not have jurisdiction to hold a hearing on SEI’s motion for a remittitur.[13]
In its postjudgment motion for a remitti-tur, SEI timely requested a hearing on that motion. Therefore, SEI was entitled to such a hearing, and the trial court erred in not conducting a hearing on SEI’s re-mittitur motion before it denied the motion. See Rule 59(g), Ala. R. Civ. P. (“Presentation of any post-trial motion to a judge is not required in order to perfect its making, nor is it required that an order continuing any such motions to a date certain be entered. All such motions remain pending until ruled upon by the court (subject to the provisions of Rule 59.1), but shall not be ruled upon until the parties have had opportunity to be heard thereon.” (emphasis added)). See also Unicare, Inc. v. Hood, 823 So.2d 1252 (Ala.2001); Johns v. AT. Stephens Enters., Inc., 815 So.2d 511, 517-18 (Ala.2001). Consequently, we remand case no. 1060615 for the trial court to conduct a hearing on SEI’s motion for a remittitur, and we direct the trial court to make a return within 60 days.
Case No. 10606Í3 — The Joint Venture’s Cross-claim
SEI argues in its appeal in case no. 1060643 that if it is entitled to a JML or a new trial on Rivers’s claims, it is also entitled to a JML or a new trial on the joint venture’s cross-claim. SEI, however, is not entitled to a JML or a new trial on Rivers’s claims; therefore, SEI is not entitled to a JML or a new trial on the joint venture’s cross-claim. Consequently, the *51 judgment on the joint venture’s cross-claim is affirmed.
Case No. 1060876 — Judgment Awarding Costs and Attorney Fees

I.

In the trial court, Rivers filed a motion to tax costs against SEI. Among other things, the motion requested $12,080.19 for “witness expenses.” That sum was based on 12 separate “witness expenses.” The trial court awarded Rivers one-half of the total requested amount, or $6,040.10.
SEI argues that Rivers was entitled to recover only 1 of the 12 costs he requested; specifically, SEI contends that the $215.17 Rivers requested for mileage expenses for Moss was the only recoverable cost. SEI argues that the remaining $5,824.93 was awarded to Rivers for the payment of Rivers’s expert witnesses, and SEI contends that the trial court exceeded its discretion in awarding those costs.
In Garrett v. Whatley, 694 So.2d 1390, 1391-92 (Ala.Civ.App.1997), the Court of Civil Appeals addressed a claim that the trial court had exceeded its discretion in awarding, as a part of the costs for the action, fees for expert witnesses:
“In Cooper v. Cooper, 57 Ala.App. 674, 331 So.2d 689, cert. denied, 331 So.2d 695 (Ala.1976), this court noted that ‘[t]he court cannot award expert’s fees as a matter of costs unless allowed by statute.’ 57 Ala.App. at 680, 331 So.2d at 694-95 (citing Hartley v. Alabama Nat’l Bank, 2A1 Ala. 651, 25 So.2d 680 (1946)). Although we have allowed expert fees as a component of otherwise compensable attorney fees, see Cooper, 57 Ala.App. at 680, 331 So.2d at 695, and as an item of costs in workers’ compensation actions pursuant to the authority of § 25-5-89, Ala.Code 1975, see Universal Forest Prods, v. Ellenburg, 627 So.2d 395, 397 (AIa.Civ.App.1992), aff'd in pertinent part by Ex parte Ellenburg, 627 So.2d 398 (Ala.1993), we have recently reaffirmed and applied the above-quoted principle. In Davis v. Davis, 686 So.2d 1245 (Ala.Civ.App.1996), we reversed a portion of a divorce judgment awarding expert fees as costs to the prevailing party, citing Cooper and Hartley. 686 So.2d at 1249-50.
“We have been directed to no statute that would support the award of any portion of the accountant’s fees and the appraiser’s fee in this action. Accordingly, on the authority of Davis, Cooper, and Hartley, we must conclude that the trial court abused its discretion in this case.”
In granting Rivers’s request for witness expenses in the present case, the trial court did not state which witness expenses it allowed and which it disallowed. Rivers does not dispute that fees for an expert witness are generally not recoverable in the absence of a statute allowing their recovery, but he argues that not all the requested “witness expenses” were for expert-witness fees. Rivers cites two examples of witness expenses that he contends were not solely for expert-witness fees: $160 for what Rivers describes as “the fact testimony” of Dr. James Banos, a neuro-psychologist, and $1,500 for the deposition of Dr. William C. Woodall III, a physician who treated Rivers. Even so, Rivers acknowledges that both Dr. Woodall and Dr. Banos were qualified as experts, but he argues that they were “essentially fact witnesses who evaluated and treated Rivers and were called to testify about his injuries, treatment, conditions, and expectations regarding his future.” (Rivers’s brief, p. 67.)
Other than the expenses for Dr. Banos and Dr. Woodall, Rivers apparently concedes that the remainder of the witness expenses awarded were for expert-witness *52 fees. He contends, however, that the costs were nevertheless recoverable because, he says, they were costs “incurred in prosecuting” his action. In essence, Rivers is arguing that an expert’s fees are recoverable if that expert’s testimony is somehow necessary or essential to a party’s case. However, according to Cooper v. Cooper, 57 Ala.App. 674, 331 So.2d 689 (1976), and Garrett, supra, and the authorities cited therein, the trial court does not have the discretion to award fees for expert witnesses unless a statute authorizes the recovery of such fees.
Rivers has not demonstrated that the “witness expenses” in this case were “a component of otherwise compensable attorney fees, see Cooper, 57 Ala.App. at 680, 331 So.2d at 695.” Garrett, 694 So.2d at 1392. Indeed, Rivers acknowledged in his motion in the trial court that he was not seeking the witness expenses as a part of a request for attorney fees. Likewise, Rivers has not provided any statutory authority suggesting that fees paid to expert witnesses are recoverable if those experts also serve as “fact” witnesses or if the fees of those experts are otherwise “incurred in prosecuting” an action. Consequently, the trial court exceeded its discretion in awarding $5,824.93 to Rivers for fees for expert witnesses, and that part of the trial court’s judgment is reversed.

II.

The trial court awarded the joint venture $66,155.35 in attorney fees, which the trial court based on an indemnity agreement between SEI and the joint venture. We consider two of SEI’s challenges to that award.
First, SEI argues that the joint venture failed to provide sufficient proof of the attorney fees to which it claimed it is entitled. We disagree. The joint venture sought attorney fees of $73,786.89, and in support of that claim it submitted detailed invoices and the affidavit of John Dodson, a licensed attorney in Birmingham, who testified that the amounts charged in the invoices were reasonable and necessary for the joint venture’s defense of Rivers’s claims. The invoices and Dodson’s affidavit based on those invoices provided sufficient proof of the attorney fees that the joint venture claimed.
Second, among other things, SEI argues that the amount of attorney fees awarded is excessive because, SEI contends, it includes fees for services rendered to establish the joint venture’s right to indemnification. We agree.
In Stone Building Co. v. Star Electrical Contractors, Inc., 796 So.2d 1076, 1091-92 (Ala.2000), this Court quoted with approval the following from the Court of Civil Appeals:
“ We are aware that it appears to be well settled in other jurisdictions that an indemnitee is entitled to recover, as part of the damages, reasonable attorney fees which it is compelled to pay as a result of suits against it in reference to the matter against which it is indemnified. 42 C.J.S. Indemnity § 13(d) (1968). The indemnification of attorney fees is, however, subject to certain limitations. For instance, the allowance of attorney fees is limited to the defense of the claim indemnified against and does not extend to services rendered in establishing the right of indemnity. 41 Am.Jur.2d Indemnity § 36 (1955); see, e.g., United General Ins. Co. v. Crane Carrier Co., 695 P.2d 1334 (Okla.1984); [.E.C.J Ernst, [Inc. v. Manhattan Constr. Co., 551 F.2d 1026 (5th Cir.1977) ].
“ ‘Furthermore, there is considerable authority holding that an indemni- *53 tee is precluded from recovering attorney fees where the indemnitee has been required to defend accusations which encompass his own separate wrongful acts. See, e.g., Farr v. Armstrong Rubber Co., 288 Minn. 83, 179 N.W.2d 64 (1970); Piedmont Equipment Co. v. Eberhard Mfg. Co., 99 Nev. 523, 665 P.2d 256 (1983). In other words, indemnification, including attorney fees, is allowed where one is defending claims predicated solely upon another defendant’s negligence; however, where one is defending for his own benefit, an award of attorney fees will not be allowed.’
“Jack Smith Enters, v. Northside Packing Co., 569 So.2d 745, 746 (Ala.Civ.App. 1990) (emphasis in original).”
SEI contends that the invoices the joint venture submitted in support of its claim for attorney fees show that $19,633 of the $73,786.89 claimed in fees was for services rendered to establish the joint venture’s right of indemnity. Although SEI has not, in its materials to this Court, delineated each item in those invoices that it relied upon to reach the sum $19,633, the joint venture acknowledged in the trial court at the hearing on its request for attorney fees (1) that approximately $20,000 of the $73,786.89 in requested fees was indeed for services rendered to establish the joint venture’s right of indemnity, and (2) that it was not entitled to recover those specific attorney fees. Thus, the trial court erred in awarding attorney fees for those services rendered to establish the joint venture’s right to indemnification. Consequently, the judgment awarding the joint venture attorney fees is reversed, and the case is remanded for the trial court to consider, in light of this opinion, the evidence submitted regarding the joint venture’s claim for attorney fees.[14]

Conclusion

In case no. 1060615, we remand the cause for the trial court to conduct a hearing on SEI’s motion for a remittitur, and the trial court is directed to make a return to this Court within 60 days.
The judgment in case no. 1060643 is affirmed.
In case no. 1060876, the judgment awarding Rivers “witness expenses” is affirmed to the extent Rivers claimed $215.17 for the mileage expenses of Moss; in all other respects, the judgment awarding “witness expenses” is reversed. Further, the judgment in case no. 1060876 awarding attorney fees to the joint venture is reversed, and the cause is remanded for the trial court to consider the evidence submitted regarding the joint venture’s claim for attorney fees.
*54 1060615 — REMANDED WITH DIRECTIONS.
1060643 — AFFIRMED.
1060876 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and SEE, WOODALL, and PARKER, JJ., concur.

On Return to Remand

SMITH, Justice.
On June 27, 2008, we remanded this case with directions for the trial court to conduct a hearing on the motion for a remittitur filed by Southeast Environmental Infrastructure, L.L.C. (“SEI”).[1] Specifically, we directed the trial court to hold a hearing to consider SEI’s motion for a remittitur of the $1.1 million compensatory-damages award and the $400,000 punitive-damages award in Larry Rivers’s action against SEI. We also directed the trial court to make a return to this Court following that hearing. In response, the trial court conducted a hearing on August 12, 2008, and entered an order on August 22, 2008, that, among other things, denied SEI’s motion for a remittitur of the compensatory- and punitive-damages awards. A copy of that order was filed with this Court on September 26, 2008.
As to the compensatory-damages award, the trial court’s order states:
“The compensatory award of $1,100,000.00 is supported by the evidence in this case. The areas of damage to Rivers in addition to the proven medical bills of $207,000.00, include, but are not limited to, loss of hearing, facial palsy, lost time and inability to work, problems with family and interpersonal interaction in social situations, difficulty in understanding and remembering instructions, the potential need for vocational re-training, depression, neurological treatment, impulsivity, disinhibition, lability, and other permanent effects of a traumatic brain injury. Dr. James Banos, neuropsyehologist, was called to testify by SEI. Dr. Banos testified that Mr. Rivers sustained impact to his head on the right side of the head in the region of the temporal and parietal bones. Dr. Banos testified that the right side of the brain can be involved in non-verbal aspects of communication, social interaction, memory for non-verbal things, images, songs and aspects of interpersonal behavior. Dr. Banos also testified that an injury to the right side of the brain will affect the left side of the body. Dr. Banos characterized Mr. Rivers’ injury as a traumatic brain injury and that the long-term consequences can include cognitive problems, memory problems, and executive functioning problems in addition to the medical problems mentioned above. Finally, Dr. Banos testified that some of the problems associated with traumatic brain injury can be lifelong with difficulties finding employment, maintaining employment, and family and interpersonal interaction issues. With regard to future treatment, Dr. Banos testified that there may [be] a future need for psychiatric treatment, treatment for depression, counseling and neurological issues.
“The Court has given significant consideration to [the] lasting impact on the mind and body of Mr. Rivers and the debilitating injury that he suffered. Accordingly, the Court concludes that the compensatory award of $1,100,000 was justified based upon the evidence and is not due to be remitted.”
*55 The trial court’s order states that, in reviewing the punitive-damages award, the trial court considered the award in light of the decisions of this Court in Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). The trial court, in upholding the $400,000 punitive-damages award, emphasized in particular the reprehensibility of SEI’s conduct[2] and noted that the ratio of the punitive-damages award to the compensatory-damages award was .36 to 1.
After reviewing the trial court’s order, we agree with the trial court that SEI was not entitled to a remittitur of the compensatory- and punitive-damages awards. Those awards are hereby affirmed.
AFFIRMED.
COBB, C.J., and SEE, WOODALL, and PARKER, JJ., concur.

. Rivers also argues that Dawson’s statement was admissible under the Alabama Rules of Evidence as (1) a present sense impression under Rule 803(1); (2) a statement against interest under Rule 804(b)(3); and (3) an excited utterance under Rule 803(2). Because we conclude that Dawson's statement was admissible as an admission by a party opponent under Rule 801(d)(2), Ala. R. Evid., we pretermit consideration of the remaining arguments in support of the trial court's admission of Dawson’s statement.

. Specifically, the contract provided:
“AH accidents shall be investigated by the subcontractor’s [SEI’s] on-site supervisor in charge and reviewed by the general contractor’s [the joint venture’s] superintendent. The on-site supervisor will prepare a written report on all accidents resulting in lost time injuries.”

. As noted, Dawson, the other eyewitness to the accident, did not testify at trial.

. As discussed below, other testimony at trial contradicted Butler’s testimony on this point.

.Specifically, Butler testified: “You asked me was [the strap] yellow and I said it ... was when we first started, you know what I'm saying. We had been out there for months so it wasn ’t new when we got to almost 90 percent of the job.” (Emphasis added.)

. Rivers's brief describes a continuous-loop strap as looking like a rubber band.

. According to Rivers's brief, an eye-to-eye or double-loop strap is flat in the middle and has a loop on each end.

. The charge given was as follows:
"In this case, the plaintiff claims the defendant is guilty of wrongfully destroying, hiding, concealing, altering or otherwise wrongfully tampering with material evidence, including attempting to influence a witness’s testimony. If you are reasonably satisfied from the evidence that the defendant did or attempted to wrongfully destroy, hide, conceal, alter, or otherwise tamper with material evidence, then that fact may be considered in your deliberations concerning the validity of the defendant's defense and claims.”
APJI 15.12 states:
"In this case, the defendant claims that the plaintiff is guilty of wrongfully destroying, hiding, concealing, altering, or otherwise wrongfully tampering with material evidence (including attempts to influence a witness’s testimony ). If you are reasonably satisfied from the evidence that the plaintiff did or attempted to wrongfully destroy, hide, conceal, alter, or otherwise tamper with material evidence, then that fact may be considered in your deliberations concerning the validity of the plaintiff's claims.”
(Emphasis in original.)

. APJI 15.13 provides:
"In this case, the plaintiff claims that the defendant is guilty of wrongfully destroying, hiding, concealing, altering, or otherwise wrongfully tampering with material evidence (including attempts to influence a witness's testimony). If you are reasonably satisfied from the evidence that the defendant did or attempted to wrongfully destroy, hide, conceal, alter, or otherwise tamper with material evidence, then that fact may be considered as an inference of defendant’s guilt, culpability, or awareness of the defendant's negligence.”
(Emphasis in original.)

. As noted, Brown testified that on Monday after the accident he was informed by either Butler or Watters that an employee of SEI had taken the strap from the scene. Butler or Watters and additional SEI representatives also told Brown in subsequent conversations that the strap, which they maintained did not break, was either at another job site or that it could not be located.

. Isbell specifically identified the following OSHA safety violations:
1. SEI’s employees did not have sufficient training in the safe methods of excavation, trenching, and rigging;
2. There was no means of egress from the excavation;
3. There were no barricades around the open excavation;
4. There were no warning signs around the excavation;
5. The pipe should not have been suspended over Rivers's head at any time; and
6. SEI’s employees did not properly inspect the rigging equipment before Rivers was injured.

. SEI also argued in its motion for a remitti-tur that the compensatory-damages award was excessive. On appeal, SEI raises the same excessiveness challenge to the compensatory-damages award. Because we conclude that the trial court erred in denying the motion for a remittitur without giving SEI an opportunity to be heard on that motion, we pretermit any consideration of SEI's challenge to the compensatory-damages award based on excessiveness until the trial court has returned the case on remand.

. Citing Rule 59.1, Ala. R. Civ. P., Rivers argues that the parties could have agreed to allow the postjudgment motions to remain pending in the trial court. However, Rule 59.1 is addressed to a situation in which the trial court has not ruled on a postjudgment motion. In the present case, the trial court did not fail to rule; instead, it denied SEI's postjudgment motions. Once the trial court denied the postjudgment motions, it lost subject-matter jurisdiction over the action. Pinkerton, 961 So.2d at 101-02. Therefore, the parties could not "consent” to confer jurisdiction on the trial court to reconsider its denial of the postjudgment motions. See Ex parte Puntura, 928 So.2d 1030, 1033 (Ala.2002) ("Subject-matter jurisdiction cannot be waived ....").

. The trial court calculated the attorney-fee award by starting with the total amount of fees the joint venture claimed — $73,786.89. From that amount, the trial court subtracted $2,177, which represented fees incurred before the joint venture's request for indemnification, for a reduced amount of $71,609.89. It then subtracted $5,454.54, which the trial court stated was “the proportionate amount between [the joint venture's] pro tanto payment of $275,0000 and [Rivers's] judgment against SEI," for a final award of $66,155.35.
Although the trial court stated that "there can be no precise mathematical method to determine the proper apportionment of [the] values of [ihe joint venture’s] sub-claims," the trial court did not state the formula it used to apportion the award of attorney fees. Because we conclude that the trial court exceeded its discretion by including in its attorney-fee award fees for services to establish the right of indemnity and because we have instructed the trial court to reconsider the evidence submitted regarding the joint venture’s claim for attorney fees, we express no opinion as to (1) the appropriateness of the formula the trial court used to reduce the amount of fees claimed by the joint venture or (2) SEI's remaining objections to the award of attorney fees.

. This case was consolidated with two other appeals (1060643 and 1060876) also arising out of an action Larry Rivers filed against SEI and others. On June 27, 2008, we affirmed the judgment in case no. 1060643 and affirmed in part, reversed in part, and remanded in case no. 1060876. Neither of those cases is before us in this return to remand.

. In its order, the trial court cites evidence indicating that despite SETs notice of and knowledge about proper safety procedures for rigging and excavation, SEI exhibited a “continuous disregard for such safety rules and regulations.” For example, the trial court’s order notes that a dangerous and unsafe strap had been confiscated from SEI before Rivers's injury and that, even though SEI had been informed not to use an unsafe strap, "the evidence was overwhelming and clear and convincing that ... the rigging equipment being used [when Rivers was injured] was so deteriorated and in such a dangerous condition that a strap which should have been able to hold at least 12,000 pounds broke under a 400-600 pound load.” Additionally, the trial court’s order cites evidence of spoliation by SEI with regard to the strap involved in Rivers's injury.